GEORGE HOLMES, PLAINTIFF IN ERROR, *vs.* SILAS H. JENNISON, GOVERNOR OF THE STATE OF VERMONT; AND JOHN STARKWEATHER, SHERIFF OF THE COUNTY OF WASHINGTON, IN THE SAID STATE OF VERMONT, AND THEIR SUCCESSORS IN OFFICE; DEFENDANTS IN ERROR.

In the state of Vermont, George Holmes was confined under a warrant issued by the Governor of that state, directing the sheriff of the county of Washington to convey and deliver him "to William Brown, the agent of Canada, or to such person or persons as, by the laws of said province, may be authorized to receive the same, at some convenient place on the confines of this state and the said province of Lower Canada; to the end that he, the said George Holmes, may be thence conveyed to the said district of Quebec, and be there dealt with as to law and justice appertains."

The warrant stated that "George Holmes was in the custody of the sheriff," by reason of a charge of felony sustained by indictment found by the grand jurors of the district of Quebec, in the province of Lower Canada; that "the said George Holmes, on the 31st day of January, 1838, at the parish of St. Louis of Kamouraska, in said district, did feloniously kill and murder one Louis Paschal Achille Tache; and whereas the said George Holmes not being a citizen of the state of Vermont, but a citizen of the said province of Lower Canada, and has come into this state from the said province of Canada, and the offence whereof he stands charged as aforesaid, having been committed within the jurisdiction of said province, it is fit and expedient that he, the said George, be made amenable to the laws of said province, for the offence aforesaid."

A writ of habeas corpus was, on the petition of George Holmes, issued by the Supreme Court of Vermont, and on the return thereto by the sheriff, stating the warrant of the Governor to be the cause of his detention, he was remanded by the Court. George Holmes prosecuted a writ of error to the Supreme Court of the United States. The writ of error was dismissed, the Court being equally divided.

IN error to the Supreme Court of Judicature of the State of Vermont.

On the 19th of July, 1839, George Holmes presented a petition to the Supreme Court of the State of Vermont, then in session, setting forth that he was in the custody of John Starkweather, sheriff of the county of Washington, in the common jail of Montpelier, under a warrant bearing date the 16th of April, 1839, issued by Silas H. Jennison, Governor of Vermont; and that he was unlawfully imprisoned and restrained of his personal liberty. He prayed for a writ of habeas corpus to be directed to the sheriff. The writ was issued, and the sheriff returned that he had the body of the petitioner before the Court, and that he held him in custody under the following order from the Governor of the state of Vermont:

"STATE OF VERMONT.

"To John Starkweather, Esquire, Sheriff of the County of Washington, greeting:

"Whereas, George Holmes, late of Sorel, in the province of Lower Canada, is now detained in the common jail in said Washington county, and under your custody, by reason of a certain charge of

felony, sustained by indictment found by the grand jurors of the district of Quebec, in said province, to wit: That the said George Holmes, on the 31st day of January, 1839, at the parish of St. Louis of Kamouraska, in said district, did feloniously kill and murder one Louis Paschall Achille Tache; and whereas, the said George Holmes, not being a citizen of the state of Vermont, or of any of the United States, but a citizen of the said province of Lower Canada, and has come into this state from the said province of Canada, and the offence, whereof he is charged as aforesaid, having been committed within the jurisdiction of said province, it is fit and expedient that he, the said George, be made amenable to the laws of said province. for the offence aforesaid:

"You are therefore required that, as soon as may be after the 27th day of (instant) April, the body of the said George Holmes, now in your custody, you convey and deliver to William Brown, the agent of Canada, or to such person or persons as, by the laws of the said province, may be authorized to receive the same, at some convenient place on the confines of this state and the said province of Canada; to the end, that he, the said George Holmes, may be therein conveyed to the said district of Quebec, and be there dealt with as to law and justice appertains.

"Hereof fail not, but of your doings in the premises make due return.

"Given under my hand, at Shoreham, this 16th day of April, 1839.

"S. H. JENNISON,
"*Governor of Vermont.*"

On the hearing of the habeas corpus before the Supreme Court of Vermont, evidence was produced which showed that George Holmes was a native citizen of the United States, having been born in the state of New Hampshire.

A correspondence between C. P. Van Ness, Esq., the Governor of the state of Vermont, in the year 1825, with the executive of the United States, was also given in evidence. In March, 1825, the Governor of Vermont forwarded to Mr. Clay, the Secretary of State of the United States, a communication addressed to him by "the acting Governor of Canada," stating that two soldiers of a British regiment, who had committed a robbery on two officers of the regiment, were then in confinement in jail in Burlington, Vermont, and asked that the offenders should be delivered up to a person to be authorized to receive them, to be brought to justice in the province of Canada. The Governor of Vermont, in the letter to the Secretary of State, expresses his readiness to attend to any directions the Secretary of State of the United States might please to give on the subject. The reply of Mr. Clay, which was transmitted by Governor Van Ness to the acting Governor of Canada, states: "I am instructed by the President to express his regret to your Excellency, that the request of the acting Governor of Canada cannot be complied with under any authority now vested in the executive government of the United

[Holmes *vs.* Jennison et al.]

States; the stipulation between this and the British government, for the mutual delivery of fugitives from justice, being no longer in force; and the renewal of it by treaty, being, at this time, a subject of negotiation between the two governments."

A motion was made for the discharge of the prisoner upon the ground of the insufficiency of the cause alleged for his detention, as being at variance with the provisions of the Constitution of the United States; and after a hearing of the case, the Court rendered judgment against the application, and ordered the prisoner to be remanded. George Holmes prosecuted this writ of error.

The case was argued by Mr. Van Ness, for the plaintiff in error No counsel appeared on the part of the defendants.

Mr. Van Ness, for the plaintiff in error.

The case in the record now before the Court presents two general questions. First, has this Court jurisdiction? And, secondly, if it has, is the judgment complained of erroneous?

The question of jurisdiction depends essentially upon the provisions of the Constitution of the United States, defining the powers of this Court, and upon the 25th section of the judicial act of 1789, prescribing the mode in which the judgments of state Courts, in certain cases, can be here re-examined. But before entering upon this field, it may be proper briefly to advert to the principles of the common law as it regards the prosecution of writs of error.

It appears never to have been judicially settled in England whether this writ would lie where a judgment had been rendered on the return to a habeas corpus; though the point, in one or two instances, has been incidentally alluded to, while in another it was directly agitated, but without any decisive result.

In the case of Wagoner, called the case of the city of London, reported in 8 Coke, 253, there was an objection made to the return upon a habeas corpus, that it consisted too much in recital, instead of being more direct and certain; and the Court answered, that it "was not a demurrer in law, but a return on a writ of privilege, upon which no issue could be taken or demurrer joined; neither upon the award would any writ of error lie, the return being to inform the Court of the truth of the matter in which such precise certainty is not required as in pleading."

In the case of the King *vs.* The Dean and Chapter of Trinity Chapel, in Dublin, reported in 8 Modern, 28, and in 1 Strange, 536, a writ of error was brought to the King's Bench, in England, to reverse a judgment of the King's Bench in Ireland, awarding a peremptory mandamus, and it was decided that error would not lie. In the first-mentioned report of this case, the Court is represented as saying: "It is against the nature of a writ of error to lie on any judgment but in causes where an issue can be joined and tried, or where judgment may be had upon a demurrer and joinder in demurrer, and therefore, it would not lie

[Holmes *vs.* Jennison et al.]

on a judgment for a procedendo, nor on the return of a habeas corpus." By the report of Strange, which is much more full, and doubtless, more correct, it appears that on the first argument of the case, the judges doubted as to whether the writ of error could be brought, some of them leaning one way, and some the other way. But after a second argument, they agreed that the writ could not be sustained. Nothing, however, is said about a writ of error on a habeas corpus, except that one of the judges inferred from the form in which the judgment was entered in the case of the Aylesbury men, (of which I shall presently take notice,) that that case was not thought to be one in which a writ of error could be brought. And upon looking into the reasons assigned for the decision, it will be seen, that the principal one was the omission of the words, "ideo consideratum est," in the entry of the judgment.

Here let it be observed, that in neither of the two cases referred to was there a question, whether a writ of error would lie in the case of a habeas corpus; and therefore, that whatever may have been said by the Court in either of them, upon this point, was foreign to the subject before them, and cannot be entitled to the weight of authority. And it should be particularly noticed, that the principal reason upon which the last-mentioned case was finally decided, was the omission of the words, "ideo consideratum est," in the entry of the judgment; thus placing the question, whether the decision of the Court constituted a regular judgment, upon the particular words made use of in entering such decision on the record, instead of determining that point from the nature and effect of the decision so given.

But there remains the case of the Aylesbury men, in which the question which we are now discussing, directly arose. This case occurred in the first years of the reign of Queen Anne, and is reported in 2 Salkeld, 503, and in 2 Lord Raymond, 1105, and also in Holt, 526. There was a commitment by order of the House of Commons, of certain persons, for an alleged contempt, in having commenced an action against the constables of Aylesbury, for refusing to take their votes at an election for members of Parliament. The prisoners were brought before the Court of King's Bench, by a writ of habeas corpus, and three of the four judges held, that the commitment was legal; but Holt, Chief Justice, declared the contrary.

A writ of error to the House of Lords upon this judgment, having been applied for, the House of Commons insisted that none ought to be granted, while the House of Lords took the opposite side. The latter condemned the course pursued by the Commons, and requested of the Queen, "that no consideration whatever should prevail with her majesty to suffer an obstruction to the known course of justice; but that she would be pleased to give effectual orders for the immediate issuing of the writ of error." And in referring to the several objections made by the Commons, hey said : " As to the second thing they (the Commons) have taken upon them to

assert, that no writ of error lies in the case; we affirm to your majesty, with great assurance, that the House of Commons have no right or pretence to determine whether that be so or not. The right to judge when a writ of error is properly brought, is by law entrusted to that Court to which the writ of error is returnable; and, therefore, we shall not at present say any thing to your majesty, in an extra-judicial way, and before the proper time, as to the point, whether a writ of error brought upon a judgment for remanding prisoners upon a habeas corpus can be maintained."

Now, although the House of Lords did not in terms declare that the writ, if brought, would be sustained by them, yet it would certainly be unreasonable to suppose that they would have pressed the subject in the manner they did, had they been of the contrary opinion. And as this case occurred nearly one hundred years after that of the city of London, it follows most clearly, that what had been loosely said in the latter, had never grown into authority, nor had any effect towards settling the principle. The question, therefore, remains an open and unsettled one in England, to this day.

In Coke's Commentaries on Littleton, 288 b, it is laid down, that "a writ of error lieth when a man is aggrieved by an error in the foundation, proceedings, judgment, or execution." And again, that " without a judgment, or an award in the nature of a judgment, no writ of error doth lie." Now, what is a judgment, but the decision of the Court upon the case before it? And is not the decision upon the return to a habeas corpus, determining whether the imprisonment of a person is lawful or unlawful, a judgment in the case; or, at least, an award in the nature of a judgment? There is a case regularly brought before the Court, and the merits of the question which it was designed to try are examined and determined. If this determination does not constitute a judgment, I am at a loss to understand what does. And, moreover, in order to determine this, is it reasonable or proper that we should shut our eyes to the nature and character of the act performed by the Court; and look merely at the particular set of words, that may happen to be used in recording such act?

It should here be noted, that error lies in England to reverse an outlawry; that it lies upon a statute merchant: and also upon a fine ; in neither of which last two cases at least, can it be said that there is any judgment of a Court.

In the state of New York, this subject was very fully and ably discussed in the case of Van Ness Yates, reported in 6 Johnson, 337; and it was there decided by the Court of errors, the highest judicial tribunal in the state, that a writ of error would lie in the case of a habeas corpus. It is true, that there was a respectable minority in the Court, dissenting from the decision, but it can scarcely be denied that the weight of the argument was on the side of the majority. And I beg, particularly, to refer the Court to the opinion delivered by that great man, De Witt Clinton, who, though not a technical, nor even a practising lawyer, exposed in a

masterly and unanswerable manner, the weakness and absurdity of the grounds urged why a writ of error should not be considered a legal and appropriate remedy in a case of this kind.

Upon the whole, therefore, it appears to me that the jurisdiction of this Court in the present case, so far as it concerns the point whether a writ of error will lie in the case of a habeas corpus, is sustainable even upon the principles of the common law. But we will now turn to the Constitution and laws of the United States; upon which, after all, as I have already said, the question essentially rests.

The Constitution provides, that in all cases arising under the same, the laws of the United States, and the treaties made under their authority, this Court shall have appellate jurisdiction, both as to law and fact; with such exceptions, and under such regulations, as Congress shall make. By the twenty-fifth section of the Judiciary Act of 1789, a final judgment or decree in any suit, in the highest Court of law or equity in which a decision could be had, of a state, may be re-examined and reversed or affirmed in this Court, upon a writ of error, where is drawn in question, among other subjects, the validity of an authority exercised under any state, on the ground of such authority being repugnant to the Constitution or laws of the United States, and the decision of the state Court is in favour of the validity of such authority.

The principal question which the record in this case presents is, whether the authority exercised by the Governor of Vermont, under or on behalf of the state, in issuing the order for the arrest of the plaintiff in error, and his transportation to a foreign country, was in violation of, or repugnant to, the Constitution of the United States. And it has been fully settled by this Court, that it need not, in terms, be stated, that the Constitution or an act of Congress was drawn in question, in order to give the Court jurisdiction on error from a state Court; but that it is sufficient if the record shows that some one of the requisite questions was necessarily involved in the case. I will not, therefore, spend further time to prove that the subject matter of this cause may come here; but will proceed with the examination, as to whether it has been brought here in the manner prescribed by the act of Congress.

The substance of what is required is, that there should be a question of which, by the Constitution, this Court has appellate jurisdiction; the manner of bringing that question here being but matter of form. And herein consists the difference between the principles which are to govern the decision of this case, and those which are applicable to writs of error in England. There, the right to bring error appears to depend upon the form of the proceedings which are sought to be re-examined, without regard to the merits of the controversy; while here, it depends upon the principles involved in the case, without regard to the form of the proceedings.

It is but fair to suppose that it was the intention of Congress, in framing the provisions of the judicial act of 1789, which have been

already stated, to carry into execution the grant of jurisdiction contained in the Constitution; and in that light the act should be liberally construed. But so far as it may be supposed that the object was to make exceptions to the grant, the construction ought to be a strict one. And here let me make the passing remark, that although in my judgment some erroneous ideas have been entertained as it respects the power of Congress to make exceptions, yet that I do not deem it necessary to my present purpose to enter upon that question.

I return to the point; the Constitution, as we have seen, embraces in the jurisdiction, all cases arising under the same, or under the laws and treaties of the United States; while the act of Congress provides for a writ of error from the judgment of a state Court, in any suit in which certain questions, of the nature of those mentioned in the Constitution, and including the one presented by the record before the Court, shall arise. Can there be a reasonable doubt that the main object of the law was to provide for bringing up the questions specified, without reference to the particular form of the proceedings in which they might occur? Is it not plain that the terms "any suit" were intended to be used in a sense co-extensive with "all cases?" And, indeed, I feel persuaded that I might safely rest the question upon the meaning of the term "suit," by itself considered. It is defined to be "the lawful demand of one's right;" and what broader expression can be necessary to include the writ of habeas corpus, which is brought to recover one's personal liberty, the highest and most valuable of all rights?

But, finally, I view this question to have been settled, (at least in effect,) by this Court. In the case of the Columbian Insurance Company *vs.* Wheelright and others, 7 Wheat. 534, it was decided that error would lie upon the award of a peremptory mandamus. Error was also sustained in a similar case, in favour of Mr. Kendall, the Postmaster-general, 12 Peters, 524. And in the case of Weston and others *vs.* The City Council of Charleston, 2 Peters, 450, it was determined that this writ might be brought upon a denial to grant a prohibition. In the last mentioned case, the following language, with reference to the word "suit," was used by Chief Justice Marshall, in delivering the opinion of the Court: "The term is certainly a comprehensive one, and is understood to apply to any proceeding in a Court of justice, by which an individual pursues that remedy which the law affords him. The modes of proceeding may be various, but if a right is litigated between parties in a Court of justice, the proceeding by which the decision of the Court is sought is a suit."

I wish to bring back to the notice of the Court, that it has been settled in England, by the House of Lords, that neither in the case of a mandamus, or of a prohibition, can a writ of error be sustained. As to the former, it was decided in the case already cited, of the King *vs.* The Dean and Chapter of Trinity Chapel, which was

carried up to the House of Lords.    And, with regard to the latter, it was settled in the case of the Bishop of St. David's, 1 Salk. 134. 1 Lord Ray. 545.

If, then, this Court has exercised jurisdiction in both of those cases, contrary to the decisions of the highest Courts in England, why should not the jurisdiction be sustained in the one now before the Court; when it has never been determined in England that a writ of error could not be brought to reverse a judgment rendered on the return to a habeas corpus?    Surely, it will not be said that property is more worthy of the protection of this Court, than the personal liberty of the citizen.    Nor can it be pretended that a mandamus or a prohibition is esteemed a higher remedy than the writ of habeas corpus, the privilege of which was considered of so sacred a character, and so essential to the personal security of the people, that the Constitution has provided against any supersion of it, even by Congress, except in cases of rebellion or invasion.

But I will leave this part of the case, in the full persuasion that, even without any other argument or authority, the determination of this Court, and the reasons upon which it was founded in the case of Weston and others *vs.* The City Council of Charleston, is absolutely decisive in favour of the jurisdiction which I have endeavoured to maintain.

I come now to the main question in the case, which is, whether the judgment of the state Court is erroneous or not.

I am not able to present to this Court the reasons upon which the three judges of the Court below, who concurred in the decision, founded their judgment; since they have never appeared willing to assign any, though repeatedly called upon to do so.

The first point upon this part of the case, for which I contend, is, that the surrender of persons charged with the commission of crimes in foreign countries, is a mere matter of comity between nations, and not of obligation; but that whether it be the one or the other, the subject is wholly of a national character, and the power over it conferred exclusively upon the government of the Union.

Of the more early writers who have treated upon the subject, Grotius, Burlamaqui, and Vattel assert that a positive obligation exists to make the surrender; while Puffendorf, Martens, and Lord Coke deny the existence of such obligation, and hold that surrenders are only made upon the ground of national comity, or by virtue of treaty stipulations.    The authors and legal characters, who have more recently treated of the matter, in this as well as in other countries, generally, if not all of them, maintain the latter position.

There are two adjudged cases in this country which deserve to be noticed.    The one is a decision of Chancellor Kent of New York, and is to be found in 4 Johns. Ch. Rep. 106; and the other, of Chief Justice Tilghman, of Pennsylvania, reported in 10 Serg. and Rawle's Rep. 125.    Chancellor Kent insists that, by the laws of nations, there is an absolute and positive national obligation to surrender fugitives from justice, on proper demand being made.    He

undertakes to maintain that the article in the treaty of 1794, between the United States and Great Britain, providing for the mutual surrender of persons charged with murder and forgery, created no new obligation; and he even supposes it to have operated, during its existence, as a restriction, so far as it related to the crimes in regard to which surrenders were to be made. Chief Justice Tilghman maintains precisely the opposite ground; and it appears to me that no impartial man can read his opinion without acknowledging the superiority of his reasoning, and becoming convinced of the correctness of his conclusions.

There is no English authority that maintains the doctrine of obligation. In two of the cases cited by Chancellor Kent, the persons accused were sent to Ireland for trial, and in another to Calcutta; but in all three of them, it was upon the ground that this was allowable by the provisions of the Habeas Corpus Act of Charles II., since the places to which the prisoners were sent were under the dominion of the King of England. What was done with the man who was suspected of a murder in Portugal, is left in doubt; the whole report of the case being as follows: " On a habeas corpus it appeared that the defendant was committed to Newgate on suspicion of murder in Portugal, which (by Mr. Attorney) being a fact out of the king's dominions, is not triable by commission upon 35 of Henry 8, c. 3, s. 1, but by a constable and marshal; and the Court refused to bail him." It certainly does not appear that he was to be sent out of the country. The remark of Judge Heath, in the case of Meer vs. Kay, 4 Taunt. 34, although foreign to the question before the Court, so far from operating against us, clearly shows that he did not consider the surrender of criminals as a matter of obligation. He expressly put it upon the ground of the "comity of nations," that it had been held that the crew of a Dutch ship, which had run away with the vessel, might be sent back.

But the decisions and practice of our own government ought to be deemed to be conclusive upon this subject. Ever since the organization of the general government, it has been held that we were under no obligation to surrender persons who had sought an asylum here, though charged with the commission of crimes previous to their change of country. In the year 1791, the governor of South Carolina made a request that the President of the United States should demand of the governor of Florida certain persons who had committed crimes in South Carolina, and fled to Florida. Mr. Jefferson, the Secretary of State, in his report to President Washington, says: " England has no convention with any nation for the surrender of fugitives from justice, and their laws have given no power to their executive to surrender fugitives of any description, they are accordingly constantly refused; and hence England has been the asylum of the Paolis, the La Mottes, the Calonnis; in short, of the most atrocious offenders, as well as of the most innocent victims, who have been able to get there. The laws of the United States, like those of England, receive every fugitive; and no authority has been given to

[Holmes vs. Jennison et al.]

our executives to deliver them up. If, then, the United States could not deliver up to General Quesnada, (Governor of Florida,) a fugitive from the laws of his country, we cannot claim as a right the delivery of fugitives from us. And it is worthy of consideration, whether the demand proposed to be made in Governor Pinkney's letter, should it be complied with by the other party, might not commit us disagreeably, and perhaps dishonourably; for I do not think that we can take for granted that the legislature of the United States will establish a convention for the mutual delivery of fugitives; and without a reasonable certainty that they will, I think we ought not to give Governor Quesnada any ground to expect that in a similar case we would redeliver fugitives from his government."

In the year 1793, Mr. Jefferson answered an application of Mr. Genet, the French minister, in the following terms: "The laws of this country take no notice of crimes committed out of their jurisdiction. The most atrocious offender coming within their pale, is received by them as an innocent man, and they have authorized no one to seize or deliver him. The evil of protecting malefactors of every dye is sensibly felt here, as in other countries; but until a reformation of the criminal codes of most nations, to deliver fugitives from them, would be to become their accomplices. The former is viewed, therefore, as the lesser evil. When the consular convention with France was under consideration, this subject was attended to; but we could agree to go no further than is done in the ninth article of that instrument, where we agree mutually to deliver up captains, officers, marines, sailors, and all other persons, being part of the crews of vessels. Unless, therefore, the persons demanded be part of the crew of some vessel of the French nation, no person in this country is authorized to deliver them up; but on the contrary, they are under the protection of the laws."

Mr. Monroe, as Secretary of State under President Madison, in his instructions to our commissioners at Ghent, said: "Offenders, even conspirators, cannot be pursued by one power into the territory of another, nor are they delivered up by the latter, except in compliance with treaties, or by favour." And, as our government has, in all cases of applications from foreign powers, refused to surrender upon the same ground, I would ask whether these decisions, and this practice, ought not to be conclusive upon all the authorities of our national and state governments? Are we still to search among the general and vague remarks of the old writers upon the laws of nations, to ascertain what are our obligations in this respect; when they have been so fully settled by our own government? This, indeed, would be most extraordinary.

But I have said, that whether a matter of obligation, or of comity, the subject appertains exclusively to the national government. It is now well settled and understood, that there are three ways in which the states have been deprived of power by the Constitution. First, where there is a grant of power to the national government, exclusive in its terms. Secondly, where, after a grant

to that government, there is a prohibition upon the states in relation to the same object. And, thirdly, where the exercise by the states of an authority conferred upon the national government would be repugnant and incompatible.

Before proceeding to inquire whether the power to act upon the subject of surrendering fugitives from foreign countries, is included in any grant of the character described under the first of these heads; or whether, in any prohibition referred to, under the second; let us see whether it does not become exclusive in the national government, simply upon the principle stated under the last head.

From the very nature and organization of the general or national government, it is vested with the sole jurisdiction over all matters of a national character, and of external concern. The states, by the adoption of the existing Constitution, have become divested of all their national attributes, except such as relate purely to their internal concerns. They are not known to foreign governments as states, nor can they properly be distinguished by them from the mass of this nation. Every question, then, which can arise, and to which a foreign power is a party, or in relation to which any correspondence with such power becomes necessary, belongs to the government of the nation. In short, as to all such matters, we are one and indivisible; precisely the same as if we had no separate states, nor any authorities in the country except those of the Union.

Can it be denied, that the demanding and surrendering of fugitives, as between different countries, is a matter of national and of external concern? The demand is made by the government of one country upon that of another country, and the surrender made in compliance with such demand, is most clearly an act performed at the instance, and for the benefit of a foreign power. And if this is a mere matter of national comity, and not of obligation, as I believe I have satisfactorily shown, the interference of the states would be, if possible, still more improper and incompatible. Some states might practise upon one principle, and some upon another; which might lead to an entire want of uniformity in their proceedings, even as to the same foreign power. The views and plans, too, of the national government in relation to the subject, would always be subject to be frustrated and defeated by the action of the states; the consequences of all which could scarcely fail to be highly mischievous, if not actually dangerous.

Some of the writers who assert the existence of the obligation referred to, go so far as to say, that a refusal to surrender a fugitive may be cause of war. But has a state the power in this way to involve the whole nation in a foreign war? Or let us suppose that one of our states should demand a criminal from a foreign government, and the latter refuse a compliance, would the state in that case have the right to declare war? On whose behalf would she make such declaration? On her own, or on that of the national government? The moment we admit that a state can act upon a matter of this kind, we are unavoidably led into these difficulties.

For with the duty or obligation to surrender, is coupled the power to demand, and to this power follows the right to enforce such demand. Who, then, can for an instant yield his assent to a proposition so absurd and so dangerous?

From what I have already said, it appears to me there can be no room for an argument, that the states may severally act upon the subject until the national government shall have acted, or until the two powers come in competition with each other. If this were to be the rule, then the United States, by entering into regulations with some foreign nations, would deprive the states of their powers with regard to such nations, while they would remain as to other countries, and might be exercised upon entire distinct principles from those adopted by such regulations. Some states, too, as already stated, might decide one way, and some another way; so that we might have between the national and the state governments, several different and contradictory practices in relation to the same matter. It follows, therefore, that this is a power which, independently of its being purely of a national and external character, is not susceptible of being divided up, among the national and state governments, or of being concurrently exercised between them.

But I apprehend, that the states are prohibited by the Constitution from acting upon this subject. The powers of war and peace, and of making treaties, are conferred upon the general government; and at the same time, expressly prohibited to the states. Every incident, therefore, which follows the grant, is equally included in the prohibition; and thus is the whole subject of the foreign relations of the country placed under the exclusive jurisdiction of the government of the Union. That the matter now in question is necessarily one of foreign intercourse, and may even call into action the war power; or, at any rate, that it is peculiarly proper for the exercise of the treaty-making power; appears so clear, that I will add nothing upon that point to what has already been said.

If it should be said, that although the United States have the power to regulate this subject by treaty, yet that until they do so, the states, by making surrenders, do not violate the Constitution of the United States, the answer, in my judgment, is easy and plain. If the United States can make a treaty for the surrender of fugitives, generally, they can make one for the surrender of a particular person; and the power to agree to make the surrender, implies the power to refuse it. Well, suppose they should refuse to enter into such a treaty in a particular case, from a conviction that the person in question ought not to be surrendered, and a state should undertake to deliver up the same person, upon the ground that the general government had made no treaty touching the case; would not this be a violation of the Constitution? And would it not be equally so, where the arrangement should be refused by our government, for some special reason arising out of our intercourse with the foreign power applying for it? The general government alone understands the state of our relations with each foreign government,

and therefore, can alone know how to act in a case of this kind towards each one of them. And it would be extraordinary that there should be no way to prevent the states from interfering, and disconcerting the action and intentions of the general government, in a matter so essentially connected with our foreign intercourse, except for the United States actually to make a treaty on the subject. But there are even some opinions that a fugitive from justice cannot be delivered up to a foreign government, in any other way than by treaty. Upon this principle it would certainly seem that the subject, as a direct and necessary consequence, belonged, by the Constitution, exclusively to the treaty-making power. For it would be a singular supposition, that the states are prohibited from making treaties with foreign powers, and yet not prohibited from doing those acts in relation to such powers, which can only be performed through the intervention of treaties.

And what measure of action by the general government, according to the doctrine against which I am contending, would bring the Constitution into actual operation upon the states? Would a treaty of the United States, with some foreign power for the mutual surrender of persons charged with murder, leave the states at liberty to make surrenders to the same power for forgery, or any other crime less than murder? I hardly think this will be contended for by any one; and yet the case, in my judgment, would stand upon the same ground, as when the United States refused to make a treaty to deliver up for any offence whatever. If the mere negative action of the general government in part, should preclude the states to the same extent, why should not the negative action in whole, have the effect to exclude them altogether? It may, perhaps, be said that the determination of the general government to surrender for one crime, was acting upon the subject, and therefore, precluded the states from surrendering for any crime; as well those left untouched, as the one provided for. But if the general government, from motives of policy, and for reasons deemed sound, should determine to make no surrenders at all to some particular power, why should not this determination have the same effect as the other? Mr. Jefferson, in his letter to Mr. Genet, said: "When the consular convention with France was under consideration, this subject was attended to; but we could agree to go no farther than is done in the ninth article of that instrument, where we agree mutually to deliver captains, officers, marines, and sailors." Can it, with reason, be contended, that after that determination it was in the power of the individual states to deliver up to the French government fugitives charged with offences against its laws?

It will be further seen that the states are prohibited even from entering, without the consent of Congress, into "any agreement or compact with another state, or with a foreign power." Now can it with any propriety be said, that a state can act upon this subject, and at the instance of a foreign government, when, at the same time, she is prohibited from entering into any agreement or compact

[Holmes vs. Jennings et al.]

with such government in relation to the same? Certainly the power to act implies the power to regulate the manner of action. If one party has a duty or obligation to perform towards another, the two ought to have a right to come to some agreement or understanding as to the way or manner of performing such duty or obligation. Is not this so plain that it cannot be misunderstood by a person of the most ordinary capacity? And, indeed, should not the very order of surrender, made at the instance of a foreign power, be deemed to constitute an agreement to make such surrender? What else can you call it, where one party asks the performance of an act, and the party applied to consents, but an agreement to do the thing required?

If then the subject in question does not belong exclusively to the national government, it does not belong to it at all. For if so vested, it is because it appertains to the foreign intercourse of the country; and is necessarily exclusive. But if not so vested, then it is among the reserved powers of the states, and remains exclusively with them. If it is a reserved power of the states, it will at once be seen that all that has been done in relation to it by the national government, from the adoption of the Constitution to this time, has been void and unconstitutional. The twenty-seventh article in Jay's treaty was void. The surrender under it of Robbins, alias Nash, was of course unauthorized. And all the negotiations and correspondence which have taken place upon the subject, during this whole time, have been without any authority. Yet nothing of this kind appears ever to have been contended for, or even suggested. The case of Robbins was largely and warmly discussed in the House of Representatives of the United States, at the time of his surrender or soon afterwards; and among all the objections raised in regard to it, no question appears to have been made of the authority of the national government over the subject, nor a suggestion that the states had any concern with it.

Again: it could only be upon the ground of connecting the subject with the right of the states to regulate their internal police, that it could be supposed to be included in their reserved powers. But none of the writers on public law have treated this question as one at all connected with the internal police of a country, or with any internal power whatever. On the contrary, it has been uniformly ranked among the questions of external and foreign concern; and is spoken of only when treating of the relations between different countries. And in the case of the City of New York vs. Miln, 11 Peters, 305, the police powers of the states were fully examined and defined by this Court; and I think it will not be denied that they were extended to their utmost limits. But at the same time, it will be perceived that the subject now under discussion was not embraced by any of the principles declared to be applicable to those powers. The state law in that case had its operation, and its whole operation, within the territory and jurisdiction of New York. It neither led nor could lead to an intercourse or correspondence with any foreign power whatever. And it had, moreover, no reference

to the commission of crimes, within or without the state, nor to the arrest of criminals of any description.

It is true that the legislature of the state of New York, several years ago, enacted a law authorizing the governor of the state, in his discretion, to surrender fugitives from foreign countries. But public opinion has lately manifested itself strongly against the validity of the law; and the governor, during the last year, refused to act under it, upon the express ground that the national government had exclusive jurisdiction over the subject, and, consequently, that the act of the legislature was unconstitutional and void.

But, secondly, if it should be admitted that a state, by some police regulations within her power to make, could effect the expulsion from her jurisdiction of a person charged with a crime in another country; still the act of the Governor of Vermont in the present case, was not of that character, but was a direct act of foreign intercourse, and, therefore, illegal and void.

The order for the arrest of the plaintiff in error was not founded upon any law of the legislature of Vermont for the regulation of her internal police; nor, in fact, upon any authority whateve: proceeding from the state. On the contrary, it is manifest from the order itself, and has always been admitted, that the governor proceeded upon the ground of a supposed obligation on the part of the state, arising under the laws of nations, to surrender fugitives from justice on the application of foreign governments; and a belief that he had a right, as the executive of the state, to fulfil such obligations, without any authority for the purpose, derived from the Constitution or legislative acts of the state. But if any further proof were wanting that the Governor of Vermont was not acting, nor authorized to act merely by virtue of his office, in the execution of any internal police regulation, it would be sufficient to point to the article in the Constitution of that state which declares, that " the people of this state, by their legal representatives, have the sole, inherent, and exclusive right of governing and regulating the internal police of the same."

Neither has there been any practice or usage of the state upon which the act in question can be attempted to be justified. Not a single person has ever been surrendered on the part of the state; and it appears by the record, that in the year 1825 there was a positive refusal to give up two men who were demanded as thieves by the Governor of Canada, and that the decision of the executive of Vermont was approved by the President of the United States. And here I beg the Court to understand, that this case is not referred to, so far as it respects the decision of the then Governor of Vermont, as an authority in point of law, but merely as one fact, among others, in order to exclude any pretence of an authority from usage for the proceeding in this case.

And equally certain is it, that so far as it regards the surrender of American citizens, there could be no reciprocity on the part of Canada; since, by the laws of that province, no subject of the realm can be sent prisoner out of the country. It was upon this ground

that Lord Aylmer, the Governor of Canada, in the year 1833, refused to surrender, on the application of the Governor of New York, four men who had come over the line, and barbarously murdered a young woman in the town of Champlain.

We have now arrived at the third and last point; which is, that admitting a state to possess the right to act upon the subject of surrendering to foreign governments fugitives from justice, yet that the sovereign power of the state must be brought into action, and the surrenders made under a regular law or proceeding of such power; and that as the act now complained of was without any such authority, it was a violation of the provision in the Constitution of the United States which declares that "no person shall be deprived of ife, liberty, or property, without due process of law."

But here arises the question, whether this provision in the Constitution is applicable to the states; or, in other words, whether it constitutes a protection against the unlawful exercise of state power. I am aware that it has been decided by this Court, in the case of Barron vs. The City of Baltimore, 7 Peters, 243, that the amendments to the Constitution of the United States, commonly called the bill of rights, were simply limitations of the powers of the general government, and had no effect upon the state governments. But as the decision is a recent one, and stands alone, I trust the Court will attend to me while I submit a few remarks upon a question so important and interesting.

Let me begin by observing that the rule of construction which can generally be resorted to, in order to determine the sense of any provision in the original Constitution, cannot be applied to the articles of amendment. The Constitution itself was one connected work, and was the result (if I may be allowed the expression) of a concentration of mind; and in deciding upon one part of it, reference may be had to other parts, and the whole so construed as consistently to stand together. But the case is very different as it regards the amendments. These have little or no connection with each other, varying both in their character and in their terms, and were originally proposed from different quarters, and with different objects. Each article, therefore, if not each clause, should be construed simply according to its own nature, and the terms in which it may be expressed.

With the utmost deference I beg leave to observe, that in my humble judgment, an error was committed by the Court, in the case referred to, in supposing all the articles of amendment to be in the nature of limitations of governmental power, or to have been so intended at the time of their adoption. When we speak of a limitation of power, we have naturally in view some power which, without such limitation, might be lawfully exercised; and of this character are the prohibitions in the original Constitution, whether relating to the general government, or to the states. That some of the amendments are of the same character is unquestionably true. But there are others which are not so; among which is the one contain-

ing the clause declaring that "no person shall be deprived of life, liberty, or property, without due process of law." These latter cannot be considered as limitations of power, but are to be understood as declarations of rights. Of absolute rights, inherent in the people, and of which no power can legally deprive them.

The right of personal liberty has existed ever since the first creation of man, and is incident to his nature. It has been recognised from the earliest organization of society, and the first institution of civil government, until the present time. And for the plain reason that this sacred right is beyond the reach of all legitimate power, it cannot properly be the subject of a limitation to the action of a regular government. Whether the declaration of this right, as well as of others, was made a part of the Constitution of the United States, with a view, principally, of guarding it from violations by the general government, it is not material to inquire. We find it there, and the only question now is, as to the extent of its operation.

That the clause in question (and indeed the whole article in which it appears) embraces every person within the limits and jurisdiction of the whole Union, will not be denied. All that remains to be determined is, whether it is to be construed as leaving the states free to encroach upon the right which it declares every one shall enjoy; or whether it is to be understood as recognising and adopting the principle that no power from any quarter can do so. In other words, whether the clause was inserted because it was deemed more proper for the states than for the general government to deprive a person of his life or liberty without law ; or, whether, to promulgate a general command against the violation of a right possessed by a title above all legitimate governmental power.

If it should be supposed that in forming the Constitution, no protection was wanted from the general government against the illegal exercise of state power, the answer is, that this, though generally true, is by no means universally so. There are several restrictions upon the states in the Constitution, for the benefit and security of the people ; and that, too, where the same powers are prohibited to the general government. One, for example, is, that no state shall pass ex post facto laws. And this is for the reason that no person ought to be punished by any government, for an act made criminal after the fact. Yet surely this principle is not more worthy of being guarded by the general government, than that a person shall not be twice punished for the same offence; or that he shall not be deprived of his life or liberty, except by due course of law. But we find that the United States stand pledged in the Constitution to guaranty to every state in the Union a republican form of government, and to protect each of them against domestic violence; thus becoming directly and deeply interested that state power shall not be unlawfully or improperly exercised.

It may with truth be affirmed, that most of the amendments to the Constitution contain principles which lie at the very foundation of civil liberty, and are most intimately connected with the dearest

rights of the people. Principles which should be cherished and enforced by a just and parental government, to the utmost extent of its authority. Principles which, in reality, like those proclaimed from the burning mount, deserve to be diligently taught to our children, and to be written upon the posts of the houses, and upon the gates.

It is true, that most of the states have incorporated into their constitutions the same principles; though several of those instruments do not contain the important provision relied upon in this case. But this furnishes no argument against allowing them the force in the Constitution of the United States for which I contend. Some of the state constitutions also contain the prohibition against passing ex post facto laws; but does this weaken the authority of the same restriction upon the states in the general Constitution? And is it not, moreover, very proper, that the state constitutions should themselves embrace all the provisions necessary to a good government, whether they are needed for the present, or not; since it cannot be foreseen what further amendments or alterations may take place in the Constitution of the United States.

But the distinction which I have endeavoured to establish between the limitations of power and the declarations of rights, is adopted in the clearest manner in the Constitution itself. The ninth article of the amendments declares, that " the enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people." And the tenth article provides, that " the powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." Here we see that the framers of these amendments had no idea of confounding the limitations of power, and the declarations of rights; but treated each as distinct from the other. If the amendments had treated only of the former, certainly the reservation, both to the states and to the people, in the tenth article, would have answered every purpose. But the ninth article was deemed necessary as it regarded the rights declared to exist, in order to prevent the people from being deprived of others by implication, that might not be included in the enumeration.

It appears clear to my mind, then, that the provision in the Constitution to which I have referred, instead of limiting the powers of the general government, directly calls into action those powers for the protection of the citizen. That it forms a part of the supreme law of the land, by which all the authorities of the states, as well as those of the Union, are bound. And that the establishment of the contrary doctrine would essentially weaken the security of the people; since it would leave without the protection of the paramount and superintending power of the Union, the great and fundamental right of personal liberty.

The question recurs, whether the plaintiff in error was arrested and is held, " without due process of law;" and thus in violation of the Constitution of the United States. I have already said, with

3 A 2

regard to this part of the case, that the sovereign power of the state of Vermont alone could authorize the surrender. I beg now to add, that I deem this position to be maintainable, whether it depends upon comity or upon obligation; though, perhaps, its defence might be thought most complete upon the first ground.

If there is nothing upon the subject beyond comity, then it rests entirely in the discretion of the state, as to the cases in which she will make surrenders, as well as to the conditions upon which they shall take place; and, indeed, whether she will make surrenders at all. How, then, but through the sovereign power of the state, can a discretion like this be regulated or exercised? And has it not always been with us a fundamental doctrine, that discretion in rulers, although the law of tyrants, is the scourge of a free people? In a despotic form of government, the sovereign power is the will of the monarch, who can act in every instance as may suit his pleasure. But can the governor of one of our states, of his own mere will, regulate and act upon this comity?. Can he, without any authority from the Constitution, or the legislative power of his state, issue an order for the arrest and delivery to a foreign government of any person whatever? If he can do this, then is the liberty of the citizen wholly at his arbitrary disposal. Does not the bare statement, however, of this point, carry along with it an argument, so unanswerable that nothing further need be said upon it?

But it is a fact, that the only ground upon which the order for the surrender in this case has ever been attempted to be justified, was that there existed, by the laws of nations, a positive obligation on the part of the state of Vermont, to make surrenders in like cases; and that the governor of the state, by virtue of his office, had the power to carry into execution that obligation. Let us see whether this doctrine will stand the test of reason.

The laws of nations have no force over the people, individually, in any country, but only regulate the conduct of nations, as such, towards each other. If any duties or obligations are created by those laws, as between one country and another, each of these owes such duties or obligations in her collective capacity, and can only perform them as its own sovereign authority may direct or permit. In an absolute government, as already stated, the sovereignty centres in the monarch, and every thing is directed by him, according to his own arbitrary will. But in a republic, the sovereign power resides in the people, or is lodged where they have placed it; and the proceedings must always be in conformity with the principles of the government.

It follows, therefore, that when it becomes necessary, in the performance of a national duty or obligation towards a foreign power, to interfere with individuals, it can be done only through laws emanating from the sovereign authority of the state where they reside, or happen to be. For as the obedience of individuals is due only to those laws, so are they, at the same time, under their protection, and can only be reached through them. The statement of a

[Holmes *vs.* Jennison et al.]

plain and familiar case will be sufficient to exemplify this proposition. Our government deemed the country to be under an obligation, by the laws of nations, to observe neutrality in the late Canadian revolt, and to prevent our citizens from taking part in the contest; but did it attempt, in the performance of this duty, to order personal arrests, or to meddle with the liberty of the people, without laws of Congress passed expressly for the purpose? Certainly not.

The plaintiff in error, at the time of his arrest, was under the protection of the laws of the state of Vermont. In the constitution of that state it is declared, that "no person can be justly deprived of his liberty, except by the laws of the land, or the judgment of his peers;" and by an existing act of the legislature of the state, it is provided, that "no person's body shall be restrained or imprisoned, unless by authority of law." No action, moreover, has taken place by the legislature of the state upon the subject of the surrender of fugitives to foreign powers. Well, how are the people to understand these provisions? To what laws, or to the laws of what country, are they directed for protection? Why, most surely, to the laws of the same state; and such as may be known and understood by the people as laws for their immediate direction and government. Laws, in short, passed by the proper authorities for the regulation of the internal and civil concerns of the state.

But a new and extraordinary doctrine has been proclaimed, and acted upon in this case. A doctrine which, if true, would prove that the people have been labouring under a delusion, and that their fancied security was but an idle dream. That they can no longer look to the general and state constitutions, and to the most positive legislative injunctions, for protection and defence. That they cannot, as they have been taught to suppose, lay their hand upon the book containing them, and say, This is our political Bible; this is the rock of our political salvation; upon which we can rest in security, even against the blowing of the winds, or the coming of the storms. No; on the contrary, they are now directed to Grotius, to Puffendorf, and Vattel, to learn what measure of personal liberty they are entitled to, and under what circumstances they can repose in safety in the midst of their families.

It appears that the King of England, with all the royal prerogatives, does not possess the power which is claimed for the Governor of the state of Vermont. The provision of the constitution of that state to which I have referred, was copied from the great charter of English liberty, and has been there understood in a different sense. Sir W. Blackstone, in the first volume of his celebrated Commentaries, makes the following remarks: "A natural and regular consequence of this personal liberty is, that every Englishman may claim a right to abide in his own country so long as he pleases; and not to be driven from it except by the sentence of the law. No power on earth but the authority of the Parliament can send any subject of England out of the land against his will; no not even a criminal. To this purpose the great charter declares,

that no freeman shall be imprisoned, unless by the judgment of his peers, or by the law of the land." 

In Canada, the governors have uniformly refused to deliver up British subjects, because their habeas corpus act protects them. In order to place this point in a clear light, I will give an extract or two from the letter already referred to, of Lord Aylmer, to Governor Marcy, dated the 27th of May, 1833: "I have been under the necessity of delaying an answer to your Excellency's letter of the 4th of April last, in consequence of objections raised by the Attorney General of the Province, to the surrendering of the four individuals charged with the murder of Elizabeth Stevenson; that officer being of opinion, that it was not competent to the executive, in the absence of any regulation by treaty, or legislative enactment on the subject, to dispense with the provision in the habeas corpus act." Again, he says: "The subject has received every consideration, and I very much regret to say, that the opinion of the Attorney General is confirmed by a majority of those who have been called upon."

We have seen, then, that no President of the United States, no Governor of Canada, and lastly, no King of England, has ventured to act in a case of this kind, except by legislative authority, or by treaty, which is tantamount to a law. Yet we have lived to witness the attempt of the Governor of one of the states in this land of freedom, to break over all legal and constitutional restraints, and of his own will and authority, to exercise this arbitrary, this tremendous power, over the liberties of the people.

Let me here declare, that I do not mean to be understood as contending, that the clause in the Constitution of the United States which is relied upon, can be brought to bear upon every unlawful or irregular act in the course of judicial or other proceedings under the laws of the states, by which a person might be deprived of his liberty, and for which he might bring an action of false imprisonment, or have his habeas corpus, before the proper tribunals or authorities. But it certainly does appear to me, that when the executive of a state, in the exercise of a governmental power, and simply by virtue of his office, undertakes to issue an order for the arrest and transportation of an individual, for a cause over which the state has invested his department of the government with no authority or jurisdiction whatever; this Court has, by its appellate power under the twenty-fifth section of the Judicial Act of 1789, the right to interpose its protection, and to enforce the provision in question.

If I have succeeded, then, in showing that the act now complained of was wholly without law or authority; it follows that the position has been sustained, even admitting the jurisdiction of the states, yet that the plaintiff in error has been "deprived of his liberty without due process of law," and therefore, in violation of the Constitution of the United States. And thus have I completed the observations which I designed to make upon the several questions involved in the case before the Court.

[Holmes vs. Jennison et al.]

Mr. Chief Justice TANEY:

The Court have held this case under consideration for some time; and as the end of the term is now approaching, it is proper to dispose of it. The members of the Court, after the fullest discussions, are so divided that no opinion can be delivered as the opinion of the Court. It is, however, deemed advisable, in order to prevent mistakes or misconstruction, to state the opinions we have respectively formed. And in the opinion which I am now about to express, I am authorized to say, that my Brothers Story, M'Lean, and Wayne, entirely concur.

This case presents a question of great importance, upon which eminent jurists have differed in opinion. Can a state, since the adoption of the Constitution of the United States, deliver up an individual found within its territory, to a foreign government, to be there tried for offences alleged to have been committed against it? This involves an inquiry into the relative powers of the federal and state governments, upon a subject which is sometimes one of great delicacy. In the case before us the party concerned is an obscure individual, not a citizen of the United States; and who is not likely to attract any great share of public attention. But in times of war and of high excitement, the principle now to be decided may reach cases where great public interests are concerned; and where the surrender may materially affect the peace of the Union. We are fully sensible of the importance of the inquiry, and of the necessity of approaching it with the utmost deliberation and caution.

There is, however, a preliminary point to be disposed of. It has been suggested that the question above mentioned cannot be brought here, in the form in which it appears in this record; and that we have not jurisdiction to re-examine the judgment of the Supreme Court of Vermont, pronounced in a summary proceeding by habeas corpus.

The case in the record is this: George Holmes, the plaintiff in error, was arrested in the state of Vermont, on a warrant or order issued by Silas H. Jennison, as Governor of the state, and directed to John Starkweather, sheriff of the county of Washington, in said state, setting forth, that an indictment had been found by a grand jury of the District of Quebec, in the British province of Lower Canada, against the said Holmes, for the crime of murder, alleged to have been committed within the said District of Quebec; and that as it was fit and expedient, that he should be made amenable to the laws of the country where the offence was charged to have been committed, the said Starkweather was commanded to convey the body of the said Holmes to some convenient place on the confines of the state of Vermont, and the province of Lower Canada, and there deliver him to such persons as might be empowered by the Canadian authorities to receive him; to the end that he might be there dealt with as to law and justice appertained.

On the application of Holmes, a writ of habeas corpus was issued by the Supreme Court of the State of Vermont, commanding the

said Starkweather to bring into Court the body of the said Holmes: and in the return to this writ, the warrant or order of the Governor of the state, as above described, was set forth as the cause of the said arrest and detention.

Holmes being brought into Court, in obedience to the said writ of habeas corpus, his counsel moved for his discharge.; and at the same time introduced in evidence certain documents which appear in the record, (but which it is unnecessary to state here,) for the purpose of showing that the Governor had no lawful right to surrender him.

The record then proceeds to state the judgment of the Court in the following words: "Wherefore, after a full hearing of the parties, and all and singular the premises aforesaid being seen and fully examined, it is adjudged by the Court here, that the aforesaid cause of detention and imprisonment of the said George Holmes is good and sufficient in law; and that he be remanded and held accordingly, under the process set forth in the return to this writ of habeas corpus."

, It will be seen from the foregoing statement, that the proceedings in question were in the highest Court of the state of Vermont; that the judgment is formally and fully entered on its records; and it is evident from the very terms of the judgment, that the validity of the Governor's warrant was drawn in question, and decided by the Court. It will hardly be said after this judgment, that the Governor was not acting in this business under the authority of the state. There is indeed no statute of Vermont giving him the power he exercised. But his conduct has been fully examined by the highest judicial tribunal in the state, and they have adjudged that the warrant issued by him was authorized by law, and bound the sheriff to hold the prisoner, and deliver him in the manner directed to the Canadian authorities. We must receive this decision as conclusive evidence of the laws of Vermont upon this subject; and, consequently, the proceedings of the Governor must be taken as justified by the laws of the state, and treated as an authority exercised under it. Here, then, is precisely one of the cases in which the writ of error is given in the twenty-fifth section of the act of 1789.

The authority was exercised by Governor Jennison, under the state. That authority has been drawn in question in the highest Court of law in the state, upon the ground that it was repugnant to the Constitution of the United States; and the decision was in favour of the validity of the authority so exercised. The only inquiry, therefore, upon the question of jurisdiction, is, whether there has been such a judgment in such a proceeding as is described in that section; in other words, whether the judgment of the Supreme Court of Vermont, above stated, was a "final judgment" "in a suit," within the meaning of the act of Congress.

As to the final character of the judgment, the question may be disposed of in a few words. In order to determine whether a judgment is final or not, we must first inquire what is in controversy.

In this case, the validity of the Governor's warrant was the only question before the Supreme Court of Vermont, and that question was certainly finally settled: for the Court, in so many words, adjudged that the cause of the detention and imprisonment of Holmes was good and sufficient in law; and nothing more remained in the case for the action of the Court. The sheriff, upon their judgment, must have proceeded to execute the warrant, and have delivered the prisoner to the Canadian authorities without further delay; if the proceedings had not been suspended in consequence of the writ of error to this Court.

In the case of Weston and others *vs.* The City Council of Charleston, 2 Peters, 464, this Court, speaking of the meaning of the word final, in the section in question, say, "If it (the word final) were applicable to those judgments and decrees only in which the right was finally decided, and could never again be litigated between the parties, the provisions of the section would be confined within much narrower limits than the words import, or than Congress could have intended. Judgments in actions of ejectment, and decrees in Chancery dismissing a bill without prejudice, however deeply they might affect rights protected by the Constitution, laws, or treaties of the United States, would not be subject to the revision of this Court. A prohibition might issue, restraining a collector from collecting duties; and this Court would not revise and correct the judgment. The word ' final' must be understood in the section under consideration as applying to all judgments and decrees which determine the particular cause." We have given this long extract from the opinion of the Court, because it shows not only the construction which this Court have given to the act of Congress, but the reasons on which its decision has been founded. In the case now under consideration, the judgment given by the Supreme Court of Vermont certainly determined the particular case before them; and was therefore final within the meaning of the act of Congress.

It is not, however, sufficient that the decision was final; it must also be made in a. "suit," in order to give this Court the right to re-examine it upon writ of error. Was this proceeding before the Supreme Court of Vermont a "suit?"

The question can hardly, at this time, be considered as an open one in this Court. It has been examined in several cases, depending on principles entirely analogous, and the jurisdiction sustained upon the fullest consideration. It is true, that in England different opinions have been entertained upon the question whether a writ of error would lie from the refusal of a Court to discharge a party brought before it on a habeas corpus. And in the reign of Queen Anne, in the case of the Queen *vs.* Paty and others, commonly called the Aylesbury case, there was an angry controversy upon the subject, between the House of Peers and the House of Commons; in which the privileges of the latter House were particularly involved. The case is reported in 2 Salk. 503, and 2 Lord Raym. 1105; and is fully detailed in      State Trials,            In the view, how-

ever, that we take of this subject, it is unnecessary to examine particularly the English cases. They are collected together and fully examined in the Court for the Correction of Errors, in the case of Yates *vs.* The People of the State of New York, 6 Johns. Rep. 337. We refer to them merely to show that they have not been overlooked. They will be found to turn mainly upon the technical meaning applied there to the word "judgment;" in which the form in which the proceedings were had, and the decision entered, was perhaps deemed more material than the subject matter; in order to give to the decision the character of a judgment in a suit.

But, with all the strictness upon the subject in the English Courts, we are not aware of any case there in which it has been held, that a writ of error would not lie from the judgment of a Court of record, deciding, upon the return of the habeas corpus, that the warrant under which the party was held was sufficient in law to authorize his arrest and detention. Certainly, no such decision was given in the case of the Queen *vs.* Paty and others, just mentioned; and we think it would be difficult to assign any good reason for refusing the writ of error. If a party is unlawfully imprisoned, the writ of habeas corpus is his appropriate legal remedy. It is his suit in Court, to recover his liberty. In order to be effectual for the purposes for which it is intended, the proceedings must be summary; and the law has accordingly made them so. And if an officer of a state government, in the exercise of an authority forbidden by the Constitution of the United States, has deprived an individual of his liberty, why should it be supposed that the summary character of the proceedings by which he must seek to recover it, would be deemed by Congress a sufficient reason for denying him the writ of error to this Court? For this, in effect, is the whole amount of the objection. It is said, that this is not a final judgment in a suit; and that, therefore, the act of 1789 does not give the writ of error to this Court.

But whatever would, at this day, be the doctrine of the English Courts, in similar cases, we consider that the construction of the act of Congress of 1789, upon this subject, has been settled by repeated decisions in favour of the jurisdiction. The cases decided were not indeed cases of proceedings and judgments upon habeas corpus, but arose and were decided upon applications for writ of mandamus and of prohibition. Yet cases of that description stand upon the same principles with the proceedings on a habeas corpus, so far as the question now under consideration is concerned. For in cases of mandamus and prohibition, the proceedings, like those upon a habeas corpus, are summary; and the judgment given is not final in the sense in which that word is used in relation to common law judgments. And if under the act of 1789, no writ of error would lie, except in cases where the suit was brought, the proceedings had, and the judgment entered, according to the forms of a suit at common law; then the writ could not be sustained in cases where a peremptory mandamus or a prohibition had been awarded or refused. In

cases of that description, however, the construction of the act of Congress has been settled in this Court: and settled, as we think, according to the true import of its words. The construction given to it, in these cases, entitled the present plaintiff in error, as a matter of right, to have the judgment rendered against him by the Supreme Court of Vermont re-examined in this Court.

Before, however, we proceed to refer more particularly to the decisions heretofore given, it is proper to remark, that there is no material difference between the language of the law giving the writ of error from the judgment of the Circuit Court for the District of Columbia, and the language used in the twenty-second and twenty-fifth sections of the act of 1789, so far as relates to the forms of proceeding, and the nature of the judgment. Undoubtedly, there are a multitude of cases in which a writ of error will lie from the judgment of a Circuit Court, where it would not lie to this Court from a judgment rendered in a similar controversy in a state Court. But our present inquiry has nothing to do with that distinction. We are speaking merely of the nature of the proceeding in this case, and examining whether it is of that description, that under the twenty-fifth section of the act of 1789, will authorize a writ of error. The writ in that section is given from any " final judgment" " in a suit." In the act relating to the District of Columbia, it is given from any "final judgment." In the twenty-second section of the act of 1789, it is given from "final judgments" " in civil actions." These different forms of expression have always been held to mean the same thing; and, consequently, the decision of this Court upon one of them is equally applicable to the others. With this explanation, we proceed to inquire whether the habeas corpus was " a suit." We have already shown that in these proceedings an authority exercised under a state was drawn in question; that the decision was in favour of the authority; and that the judgment of the Court was final. The remaining question is, were these things done in a suit?

The first case in which this question appears to have arisen, was that of the Columbian Insurance Company *vs.* Wheelright and others, 7 Wheat. 534. The Circuit Court for the District of Columbia had in that case awarded a peremptory mandamus, to admit the defendants to the offices of directors in the said insurance company. The company, thereupon, brought a writ of error to the Supreme Court, and the question whether a writ of error would lie, from the order of a Court awarding a peremptory mandamus, was directly presented. It was argued by counsel, and decided by the Court; and it was ruled that the writ of error would lie. It is true that this case was decided under the act of Congress relating to the District of Columbia. But in delivering the opinion, the Court remark, that the law relating to the district, under which that case arose, was " similar in its provisions with the Judiciary Act of 1789, ch. 20, sec. 22." The decision therefore in that case was, in effect, a decision upon the construction of the act of 1789.

The same interpretation was again given to this act of Congress, in the case of Kendall vs. The United States, 12 Peters, 524. The question of jurisdiction was in that case most fully and deliberately considered by the Court. The English and American cases on the subject were carefully examined and discussed; and all of the objections taken in the English books, and arising from the summary form of the proceeding, and the nature of the decision, were brought forward and considered by the Court. But the case of the Columbian Insurance Company vs. Wheelright and others, was supposed to have settled the question; and the jurisdiction was sustained. There was no written opinion by the Court on this point; but the case is a recent one, and the circumstances above mentioned are yet fresh in the recollection of the members of the Court. After these two decisions, whatever may be regarded as the doctrines of the English Courts in such cases, the question whether a writ of error will lie under the twenty-second section of the act of 1789, from the judgment of a Court awarding a peremptory mandamus, can hardly be considered as open for discussion, in this Court.

We have already mentioned, that a writ of error under the twenty-fifth section, so far as it depends on the forms of proceeding, and the nature of the judgment, must be governed by the same rules that apply to similar writs under the twenty-second section, and under the act relating to the District of Columbia. But the case of Weston and others vs. The City Council of Charleston, 2 Peters, 449, which has already been referred to, arose on the twenty-fifth section itself, and appears to us to be decisive of the point in question. In that case a prohibition had been obtained by the plaintiffs in error, from the Court of Common Pleas of South Carolina, for the Charleston District, to restrain the city council of Charleston from levying a tax upon the stock of the United States, held by residents of the city. The city council removed the case by writ of error to the constitutional Court, the highest Court of law in the state, where the decision of the Court of Common Pleas was reversed; and the ordinance imposing the tax held not to be repugnant to the Constitution of the United States. From this decision a writ of error was brought to this Court, and the question was raised here, whether a prohibition was a suit, within the meaning of the act of 1789. The Court held that it was; and Chief Justice Marshall, in delivering the opinion of the Court, says, " Is a writ of prohibition a suit? The term is certainly a very comprehensive one; and is understood to apply to any proceeding in a Court of justice, by which an individual pursues that remedy in a Court of justice, which the law affords him. The modes of proceeding may be various; but if a right is litigated between the parties in a Court of justice, the proceeding by which the decision of the Court is sought, is a suit."

We entirely concur in the definition thus given of the meaning of the word " suit," as used in the act of 1789. It makes the act of Congress consistent with the principles of justice, and interprets

it according to the natural meaning of its words : and it is too plain for argument, that according to this definition, the proceedings upon the habeas corpus was a suit in the Supreme Court of Vermont; A right claimed by the prisoner Holmes, under the Constitution of the United States, was litigated between him and the Governor of the state, and the sheriff of the county, in a Court of justice. The proceedings by habeas corpus by which the decision of the Court was sought, was, in the language of the case referred to, a suit; and we cannot, therefore, refuse to take jurisdiction upon this writ of error, without disregarding the deliberate decisions of this Court.

It is very true that neither the case just mentioned, nor the cases before referred to, were writs of error upon a refusal to discharge on habeas corpus. But in the English cases, the authorities are stronger in favour of the writ of error in the case of the habeas corpus, than in the case of the mandamus. The House of Lords affirmed the judgment of the Court of King's Bench, which decided that a writ of error would not lie to that Court, from the judgment of the Court of King's Bench of Ireland, awarding a peremptory mandamus. But the House of Lords, which is the highest judicial tribunal in England, have never by any decision countenanced the idea, that a writ of error would not lie from the refusal of the Court of King's Bench to discharge a party on habeas corpus. On the contrary, in the Aylesbury case, before mentioned, they decided that a writ of error ought to be issued to bring the question before them. The Commons, indeed, vehemently denied that the writ would lie; but it will be remembered, that the Aylesbury men had been imprisoned by the House of Commons, for a breach of privilege; and that House was naturally excited by a proceeding which would have made the House of Lords in a great measure the judges of the privileges of the Commons. It is not in heated conflicts of this description between two legislative bodies concerning their respective privileges, that we are to look for calm and precise judgments on questions of law ; and neither the opinion of the Lords nor the Commons, expressed under such circumstances, ought to be esteemed as safe guides in a Court of justice. It is certain, however, that the question whether a writ of error would lie in such a case, was then an open one, upon which the two Houses differed in opinion. In New York, in the case of Yates vs. The People before mentioned, it was decided in the Court for the Correction of Errors, that a writ of error would lie from the refusal of the Supreme Court of the state to discharge a party on habeas corpus. There was, indeed, great division of opinion in the Court, and so many eminent and distinguished judges dissented from the judgment given, that we do not feel authorized to refer to it as having settled the question in New York. Yet that case, as well as the English cases, show that the point has been a doubtful one, and that the right to the writ of error in the case of the habeas corpus has always stood on firmer and better ground than in the case of the

mandamus. And we refer to these cases to show, among other things, that the Supreme Court, in the decisions before mentioned, have not overturned established principles; that they have merely settled doubtful questions, and have not settled them against the weight of judicial authority : and as the construction they have given to the word suit, in the act of 1789, is well calculated to promote the great ends of justice, and undoubtedly conforms to the intention of the legislature; we perceive no sufficient reason for setting it aside, or departing from it. Under the authority of these decisions, therefore, we hold that the judgment of the Vermont Court, now before us, was a final judgment in a suit; and the plaintiff in error is, therefore, entitled to have it re-examined in this Court by writ of error.

The case being thus before this Court, it becomes our duty to inquire whether the authority exercised by the governor of Vermont, was repugnant to the Constitution of the United States.

In this part of the case it may be well to inquire into the nature and extent of the powers which have been claimed and exercised by the Governor of Vermont. It is the power to surrender any one found within the jurisdiction of the state, who has committed an offence in a foreign country. The individual to be surrendered on this occasion was a resident of Canada. But if the state possesses the power of delivering up fugitives from justice who, having committed offences in a foreign country, have fled to this for shelter, the power, as known to the laws of nations, is not confined to the subjects or residents of the country where the offence was committed. It is limited only by the policy of the state upon whom the demand is made. And if the surrender of Holmes is not repugnant to the Constitution of the United States, there is nothing in that instrument that forbids the delivery up of a citizen of any other state, when found within its borders, who may be demanded by a foreign government upon the ground that he has committed some offence within its territory. And if this power remains with the states, then every state of the Union must determine for itself the principles on which they will exercise it; and there will be no restriction upon the power, but the discretion and good feeling of each particular state.

Again: the question under this habeas corpus is in no degree connected with the power of the states to remove from their territory any person whose presence they may think dangerous to their peace, or in any way injurious to their interests. The power of the states in that respect was fully considered by this Court and decided, in the case of New York vs. Miln, 11 Peters, 102. Undoubtedly, they may remove from among them any person guilty of, or charged with crimes; and may arrest and imprison them in order to effect this object. This is a part of the ordinary police powers of the states, which is necessary to their very existence, and which they have never surrendered to the general government. They may, if they think proper, in order to deter offenders in other countries from

coming among them, make crimes committed elsewhere punishable in their Courts, if the guilty party shall be found within their jurisdiction. In all of these cases the state acts with a view to its own safety; and is in no degree connected with the foreign government in which the crime was committed. The state does not co-operate with a foreign government nor hold any intercourse with it, when she is merely executing her police regulations. But in the case of Holmes, it is otherwise. The state acts not with a view to protect itself, but to assist another nation which asks its aid. Holmes is not removed from the state of Vermont, as a man so stained with crimes as to render him unworthy of the hospitality of the state; but he is delivered up to the Canadian authorities, as an act of comity to them. This is not the exercise of a police power, which operates only upon the internal concerns of the state, and requires no intercourse with a foreign country in order to carry it into execution: it is the comity of one nation to another, acting upon the laws of nations, and determining, for itself, how far it will assist a foreign nation in bringing to punishment those who have offended against its laws.

The power which has thus been exercised by the state of Vermont, is a part of the foreign intercourse of this country; and has undoubtedly been conferred on the federal government. Whether it be exclusive or not is another question, of which we shall hereafter speak. But we presume that no one will dispute the possession of this power by the general government. It is clearly included in the treaty-making power, and the corresponding power of appointing and receiving ambassadors, and other public ministers. The power to make treaties is given by the Constitution in general terms, without any description of the objects intended to be embraced by it; and, consequently, it was designed to include all those subjects, which in the ordinary intercourse of nations had usually been made subjects of negotiation and treaty; and which are consistent with the nature of our institutions, and the distribution of powers between the general and state governments. And without attempting to define the exact limits of this treaty-making power, or to enumerate the subjects intended to be included in it; it may safely be assumed, that the recognition and enforcement of the principles of public law, being one of the ordinary subjects of treaties, were necessarily included in the power conferred on the general government. And, as the rights and duties of nations towards one another, in relation to fugitives from justice, are a part of the law of nations, and have always been treated as such by the writers upon public law; it follows, that the treaty-making power must have authority to decide how far the right of a foreign nation in this respect will be recognised and enforced, when it demands the surrender of any one charged with offences against it.

The practice of the government, from the early days of its existence, conforms to this opinion. In the letter of Mr. Jefferson to Mr. Genet, of September 12th, 1793, 1 Am. State Pap. 175, he speaks of the right of the general government in this respect, as if it was

3 B 2        72

undisputed. And in the treaty negotiated with England by Mr. Jay during the administration of General Washington, there was an article stipulating for the mutual delivery of persons charged with murder, or forgery. The case of Jonathan Robbins, which was the only one that arose under this treaty, produced much excitement in the country and animated debates in Congress. Yet the power of the general government to enter into such an engagement was never questioned. The objections to the surrender of the party rested upon other grounds.

Indeed, the whole frame of the Constitution supports this construction. All the powers which relate to our foreign intercourse are confided to the general government. Congress have the power to regulate commerce; to define and punish piracies and felonies committed on the high seas, and offences against the laws of nations; to declare war; to grant letters of marque and reprisal; to raise and support armies; to provide and maintain a navy. And the President is not only authorized, by and with the advice and consent of the Senate, to make treaties; but he also nominates, and by and with the advice and consent of the Senate appoints ambassadors and other public ministers, through whose agency negotiations are to be made, and treaties concluded. He also receives the ambassadors sent from foreign countries: and every thing that concerns our foreign relations, that may be used to preserve peace or to wage war, has been committed to the hands of the federal government. The power of deciding whether a fugitive from a foreign nation should or should not be surrendered, was, necessarily, a part of the powers thus granted.

It being evident, then, that the general government possesses the power in question, it remains to inquire whether it has been surrendered by the states. We think it has: and upon two grounds. 1. According to the express words of the Constitution, it is one of the powers that the states are forbidden to exercise without the consent of Congress. 2. It is incompatible and inconsistent with the powers conferred on the federal government.

The first clause of the tenth section of the first article of the Constitution, among other limitations of state power, declares, that " no state shall enter into any treaty, alliance, or confederation;" the second clause of the same section, among other things, declares that no state without the consent of Congress, shall " enter into any agreement or compact with another state, or with a foreign power."

We have extracted only those parts of the section that are material to the present inquiry. The section consists of but two paragraphs; and is employed altogether in restrictions upon the powers of the states. In the first paragraph, the limitations are absolute and unconditional; in the second, the forbidden powers may be exercised with the consent of Congress: and it is in the second paragraph that the restrictions are found which apply to the case now before us.

In expounding the Constitution of the United States, every word

must have its due force, and appropriate meaning; for it is evident from the whole instrument, that no word was unnecessarily used, or needlessly added. The many discussions which have taken place upon the construction of the Constitution, have proved the correctness of this proposition; and shown the high talent, the caution, and the foresight of the illustrious men who framed it. Every word appears to have been weighed with the utmost deliberation, and its force and effect to have been fully understood. No word in the instrument, therefore, can be rejected as superfluous or unmeaning; and this principle of construction applies with peculiar force to the two clauses of the tenth section of the first article, of which we are now speaking, because the whole of this short section is directed to the same subject; that is to say, it is employed altogether in enumerating the rights surrendered by the states; and this is done with so much clearness and brevity, that we cannot for a moment believe that a single superfluous word was used, or words which meant merely the same thing. When, therefore, the second clause declares, that no state shall enter into "any agreement or compact" with a foreign power without the assent of Congress, the words "agreement" and "compact," cannot be construed as synonymous with one another; and still less can either of them be held to mean the same thing with the word "treaty" in the preceding clause, into which the states are positively and unconditionally forbidden to enter; and which even the consent of Congress could not authorize.

In speaking of the treaty-making power conferred on the general government, we have already stated our opinion of the meaning of the words used in the Constitution, and the objects intended to be embraced in the power there given. Whatever is granted to the general government is forbidden to the states, because the same word is used to describe the power denied to the latter, which is employed in describing the power conferred on the former; and it is very clear, therefore, that Vermont could not have entered into a treaty with England, or the Canadian government, by which the state agreed to deliver up fugitives charged with offences committed in Canada.

But it may be said, that here is no treaty; and, undoubtedly, in the sense in which that word is generally understood, there is no treaty between Vermont and Canada. For when we speak of "a treaty," we mean an instrument written and executed with the formalities customary among nations; and as no clause in the Constitution ought to be interpreted differently from the usual and fair import of the words used, if the decision of this case depended upon the word above mentioned, we should not be prepared to say that there was any express prohibition of the power exercised by the state of Vermont.

But the question does not rest upon the prohibition to enter into a treaty. In the very next clause of the Constitution, the states are forbidden to enter into any "agreement" or "compact" with a foreign nation; and as these words could not have been idly or superflu-

ously used by the framers of the Constitution, they cannot be construed to mean the same thing with the word treaty. They evidently mean something more, and were designed to make the prohibition more comprehensive.

A few extracts from an eminent writer on the laws of nations, showing the manner in which these different words have been used, and the different meanings sometimes attached to them, will, perhaps, contribute to explain the reason for using them all in the Constitution; and will prove that the most comprehensive terms were employed in prohibiting to the states all intercourse with foreign nations. Vattel, page 192, sec. 152, says: "A treaty, in Latin fœdus, is a compact made with a view to the public welfare, by the superior power, either for perpetuity, or for a considerable time."

Section 153. "The compacts which have temporary matters for their object, are called agreements, conventions, and pactions. They are accomplished by one single act, and not by repeated acts. These compacts are perfected in their execution once for all; treaties receive a successive execution, whose duration equals that of the treaty."

Section 154. Public treaties can only be made by the "supreme power, by sovereigns who contract in the name of the state. Thus conventions made between sovereigns respecting their own private affairs, and those between a sovereign and a private person, are not public treaties."

Section 206, page 218. "The public compacts called conventions, articles of agreement, &c., when they are made between sovereigns, differ from treaties only in their object."

After reading these extracts, we can be at no loss to comprehend the intention of the framers of the Constitution in using all these words, "treaty," "compact," "agreement." The word "agreement," does not necessarily import any direct and express stipulation; nor is it necessary that it should be in writing. If there is a verbal understanding to which both parties have assented, and upon which both are acting, it is an "agreement." And the use of all of these terms, "treaty," "agreement," "compact," show that it was the intention of the framers of the Constitution to use the broadest and most comprehensive terms; and that they anxiously desired to cut off all connection or communication between a state and a foreign power: and we shall fail to execute that evident intention, unless we give to the word "agreement" its most extended signification; and so apply it as to prohibit every agreement, written or verbal, formal or informal, positive or implied, by the mutual understanding of the parties.

Neither is it necessary, in order to bring the case within this prohibition, that the agreement should be for the mutual delivery of all fugitives from justice, or for a particular class of fugitives. It is sufficient, if there is an agreement to deliver Holmes. For the prohibition in the Constitution applies not only to a continuing agreement embracing classes of cases, or a succession of cases, but to any agree-

ment whatever. An agreement to deliver Holmes is therefore forbidden; and as much so as if it were an agreement to deliver all persons in the same predicament.

Is there not then in this case an agreement on the part of Vermont to deliver Holmes? And is he not detained in custody, to be delivered up pursuant to this agreement?

It must be remembered that states can act only by their agents and servants; and whatever is done by them, by authority of law, is done by the state itself. The Supreme Court of Vermont, as we have already mentioned, have decided that the warrant of the Governor, and the detention of Holmes under it, are authorized by law. Consequently, the seizure for the purpose of delivery, the agreement on the one side to deliver, and on the other to receive, is an agreement made by the authorized servants of the state; and, of course, in contemplation of law, made by the state itself.

The record before us does not state the application of the Governor of Canada for the arrest and delivery of Holmes, although, from the nature of the transaction, doubtless such an application was made. As it does not, however, appear in the record, we do not act upon the supposition that such a demand was made, nor consider it as in the case. The question is not whether there was a demand, but whether there was an agreement with a foreign power; and the governor's warrant of itself imports an agreement with the Canadian authorities. It directs Holmes to be delivered "to William Brown, the agent of Canada, or to such person or persons as by the laws of the province are authorized to receive him." How is he to be delivered unless they accept? And if the authorities of Vermont agree to deliver him, and the authorities of Canada agree to accept, is not this an agreement between them? From the nature of the transaction, the act of delivery necessarily implies a mutual agreement.

Every one will admit that an agreement formally made to deliver up all offenders who, after committing crimes in Canada, fly for shelter to Vermont, would be unconstitutional on the part of the state. So an agreement, after Holmes had escaped to Vermont, written and signed by the state and provincial authorities, by which the Governor of Vermont engaged to seize him and deliver him up to the Canadian officers, would, unquestionably, be unconstitutional. Yet precisely the same thing is done in this case, without a regular and formal agreement. It is, in some way or other, mutually understood by the parties that he shall be seized and delivered up; and he is seized, accordingly, in order to be delivered up, pursuant to this understanding. Can it be supposed that the constitutionality of the act depends on the mere form of the agreement? We think not. The Constitution looked to the essence and substance of things, and not to mere form. It would be but an evasion of the Constitution to place the question upon the formality with which the agreement is made. The framers of the Constitution manifestly believed

that any intercourse between a state and a foreign nation was dangerous to the Union; that it would open a door of which foreign powers would avail themselves to obtain influence in separate states. Provisions were therefore introduced to cut off all negotiations and intercourse between the state authorities and foreign nations. If they could make no agreement, either in writing or by parol, formal or informal, there would be no occasion for negotiation or intercourse between the state authorities and a foreign government. Hence prohibitions were introduced, which were supposed to be sufficient to cut off all communication between them.

But if there was no prohibition to the states, yet the exercise of such a power on their part is inconsistent with the power upon the same subject conferred on the United States.

It is admitted that an affirmative grant of a power to the general government, is not of itself a prohibition of the same power to the states; and that there are subjects over which the federal and state governments exercise concurrent jurisdiction. But, where an authority is granted to the Union, to which a similar authority in the states would be absolutely and totally contradictory and repugnant, there the authority to the federal government is necessarily exclusive; and the same power cannot be constitutionally exercised by the states.

The exercise of the power in question by the states, is totally contradictory and repugnant to the power granted to the United States. Since the expiration of the treaty with Great Britain, negotiated in 1793, the general government appears to have adopted the policy of refusing to surrender persons, who, having committed offences in a foreign nation, have taken shelter in this. It is believed that the general government has entered into no treaty stipulations upon this subject since the one above mentioned; and in every instance where there was no engagement by treaty to deliver, and a demand has been made, they have uniformly refused, and have denied the right of the executive to surrender, because there was no treaty, and no law of Congress to authorize it. And acting upon this principle throughout, they have never demanded from a foreign government any one who fled from this country in order to escape from the punishment due to his crimes.

This being the policy of the general government, is not the possession of the power by the states totally contradictory and repugnant to the authority conferred on the federal government? What avails it that the general government, in the exercise of that portion of its power over our foreign relations, which embraces this subject, deems it wisest and safest for the Union to enter into no arrangements upon the subject, and to refuse all such demands; if the state in which the fugitive is found, may immediately reverse this decision, and deliver over the offender to the government that demands him? If the power remains in the states, the grant to the general government is nugatory and vain; and it would be in the power of any state to overturn and defeat the decisions of the general government,

upon a subject admitted to be within its appropriate sphere of action; and to have been clearly and necessarily included in the treaty-making power.

The power in question, from its nature, cannot be a concurrent one, to be exercised both by the states and the general government. It must belong, exclusively, to the one or the other. If it were merely the power to surrender the fugitive, it might be concurrent; because either might seize and surrender, whose officers could first lay hold of him. But the power in question, as has already been stated, is a very different one. It is the power of deciding the very delicate question, whether the party demanded ought or ought not to be surrendered. And in determining this question, whether the determination is made by the United States or a state, the claims of humanity, the principles of justice, the laws of nations, and the interests of the Union at large, must all be taken into consideration, and weighed when deliberating on the subject. Now it is very evident, that the councils of the general government and of the state may not always agree on this subject. The decision of the one may stand in direct opposition to the decision of the other. How can there be a concurrent jurisdiction in such a case? They are incompatible with each other, and one must yield. And it being conceded on all hands, that the power has been granted to the general government, it follows that it cannot be possessed by the states; because its possession on their part would be totally contradictory and repugnant to the power granted to the federal government.

Again, how are the states to exercise this power? We must not look at the power claimed as if it were confined to fugitives from Canada into the bordering states. The Constitution makes no distinction in that respect; and if the state has the power in this instance, it has the same power in relation to fugitives from England, or France, or Russia. Now, how is a state to hold communications with these nations? The states neither send nor receive ambassadors to or from foreign nations. That power has been expressly confided to the federal government. How, then, are negotiations to be carried on with a state when a fugitive is demanded? Are they to treat upon this subject with the ambassador received by the United States? And is he, after being refused by the general government, to appeal to the state to reverse that decision? Such, certainly was not the intention of the framers of the Constitution; and cannot be its true construction. Every part of that instrument shows that our whole foreign-intercourse was intended to be committed to the hands of the general government: and nothing shows it more strongly than the treaty-making power, and the power of appointing and receiving ambassadors; both of which are immediately connected with the question before us, and undoubtedly belong exclusively to the federal government. It was one of the main objects of the Constitution to make us, so far as regarded our foreign relations, one people, and one nation; and to cut off all communications between foreign governments, and the several stat

authorities. The power now claimed for the states, is utterly incompatible with this evident intention; and would expose us to one of those dangers, against which the framers of the Constitution have so anxiously endeavoured to guard.

But it may be said, that the possession of the power to surrender fugitives to a foreign nation by the states, is not incompatible with the grant of the same power to the United States; and that in the language of this Court, in the case of Sturges vs. Crowningshield, 4 Wheat. 196, "it is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states." And the case before us may perhaps be likened to those cases in which affirmative grants of power to the general government, have been held not to be inconsistent with the exercise of the same powers by the states, while the power remained dormant in the hands of the United States.

This principle is, no doubt, the true one, in relation to the grants of power, to which it is applied in the case above mentioned of Sturges vs. Crowningshield. For example, the grant of power to Congress to establish "uniform laws on the subject of bankruptcies throughout the United States," does not of itself carry with it an implied prohibition to the states to exercise the same powers. But in the same case of Sturges vs. Crowningshield, another principle is stated, which is equally sound, and which is directly applicable to the point before us; that is to say, that it never has been supposed that the concurrent power of state legislation extended to every possible case in which its exercise had not been prohibited. And that whenever "the terms in which a power is granted to Congress, or the nature of the power requires that it should be exercised exclusively by Congress; the subject is as completely taken from the state legislatures, as if they had been expressly forbidden to act on it." This is the character of the power in question. From its nature, it can never be dormant in the hands of the general government.

The argument which supposes this power may be dormant in the hands of the federal government, is founded, we think, in a mistake as to its true nature and character. It is not the mere power to deliver up fugitives from other nations upon demand; but the right to determine whether they ought or ought not to be delivered, and to make that decision, whatever it may be, effectual. It is the power to determine whether it is the interest of the United States to enter into treaties with foreign nations generally, or with any particular foreign nations, for the mutual delivery of offenders fleeing from punishment from either country; or whether it is the interest and true policy of the United States, to abstain altogether from such engagements, and to refuse, in all cases, to surrender them. In the case first above supposed, it will be admitted that if the United States have entered into such treaties, the states could not interfere, because the United States will then have exercised the power; and the exercise of the same power by the states would be altogether contradictory and repugnant. It is in the latter case, where they

refuse to treat, and refuse to surrender, that the power is supposed to be dormant, and not exercised by the federal government. But is not this a mistake as to the nature of the power? And is it not as fully exercised by the decision not to surrender, as it could be by a decision the other way? The question to be decided is a question of foreign policy; committed, unquestionably, to the general government. The federal government has also the power to declare war; and whenever it becomes a question whether we are to be at peace or at war, undoubtedly the general government must determine that question. And if Congress decides that the honour and interest of the country does not require war, and, on that account, refuses to declare it, is not this an exercise of its power over the subject? And could it be said that the power was a dormant power, because war had not been declared?

There is, however, an express prohibition to the states to engage in war; and perhaps the case of ambassadors would be more analogous to the one under consideration. The power of appointing "ambassadors, other public ministers, and consuls," is given to the federal government; and there is no prohibition to the exercise of the same power by the states. Now, if the general government deemed it to be the true policy of the country to have no communication or connection with foreign nations, by ambassadors, other public ministers, or consuls; and refused, on that account, to appoint any; could it be said that this power was dormant in the hands of the government, and that the states might exercise it? Or if the general government deemed it advisable to have no such communications with some particular foreign nation, could any state regard it as an unexercised power, and therefore undertake to exercise it? We can readily imagine that there may be reasons of policy, looking to the whole Union, that might induce the government to decline an interchange of ambassadors with certain foreign countries. It is not material to the question in hand, whether that policy be right or wrong. But assuming such a case to exist, can any state regard it as an unexecuted portion of the power granted to the federal government; and, by appointing an ambassador or consul, counteract its designs, and thwart its policy? There can be but one answer, we think, given to this question. And yet the case before us, is in all respects like it. It is a portion of our foreign policy, and of our foreign intercourse. The general government must act, for it is the only nation known to foreign powers; and as their ambassadors are accredited to the United States, and not to the states, whatever demands they have, they must address to the general government. And in every case, therefore, where an offender, such as we are speaking of, is within the United States, and the foreign government desires to get possession of him; the demand must be made on the general government: and they are as much bound to decide upon it, as they are upon a question of sending or receiving an ambassador, or a question of peace or war. How, then, can a state exercise a concurrent power, or any power on the same question? In the lan-

guage of the Supreme Court, in the case of Houston *vs.* Moore, 5 Wheat. 23, " we are altogether incapable of comprehending how two distinct wills can at the same time be exercised in relation to the same subject, to be effectual; and, at the same time, compatible with one another."

The confusion and disorder which would arise from the exercise of this power by the several states, is too obvious to need comment. At the present moment, when Europe is at peace, there is no strong inducement to pursue an offender who has taken refuge in this country ; and very earnest efforts, therefore, are not often made to obtain possession of the fugitive. But in the ordinary course of human affairs, this cannot always be the case; and if civil commotions should take place in any of the great nations of Europe, powerful inducements will often exist to pursue those who may be compelled to fly from the vengeance of the victorious party. And in case a war should break out between any of the leading governments of the old world, sufficient motives will perhaps be found to make the belligerent nations extremely anxious to obtain possession of persons who may be found in some one of the United States. And how could this great national power be exercised with uniformity or advantage, if the several states were, from time to time, to determine the question ? One would probably determine to surrender for one set of offences ; another, another. One state, perhaps, would surrender for political offences; another would not: and one state might deliver up fugitives to one nation only ; while another state would select some other foreign nation, as the only object of this comity. Such conflicting exercises of the same power would not be well calculated to preserve respect abroad or union at home. In times of high excitement, nothing but mischief could grow out of it.

Nor do we perceive any advantage that could arise to the states at any time from the possession of this power. It is, as we have already said, in no degree connected with their police powers; and they can, undoubtedly, remove from their territory every description of offenders who, in the judgment of the legislature, are dangerous to the peace of the state. It may, indeed, be supposed that along the border line which separates the Canadas from the United States, the facility of escape into another jurisdiction is a temptation to crime, and that an arrangement between the authorities of the province and the states which adjoin them, for the mutual delivery of offenders, would be advantageous to both. If such an arrangement is deemed desirable, the foresight of the framers of the Constitution have provided the way for doing it, without interfering with the powers of foreign intercourse committed to the general government, or endangering the peace of the Union. Under the second clause of the tenth article of he first section of the Constitution, any state, with the consent of Congress, may enter into such an agreement with the Canadian authorities. The agreement would, in that event, be made under the supervision of the United States,

[Holmes *vs.* Jennison et al.]

and the particular offences defined in which the power was to be exercised; and the national character of the persons who were to be embraced in it, as well as the proof to be required to justify the surrender. The peculiar condition of the border states would take away all just cause of complaint from other nations, to whom the same comity was not extended; and at the same time, the proper legal safeguards would be provided, for the protection of citizens of other states, who might happen to become obnoxious to the Canadian authorities, and be demanded as offenders against its laws. They would not be left to the unlimited discretion of the states in which they may happen to be found, when the demand is made; as must be the case, if the power in question is possessed by the states.

Upon the whole, therefore, my three Brothers, before mentioned, and myself; after the most careful and deliberate examination; are of opinion, that the power to surrender fugitives, who, having committed offences in a foreign country, have fled to this for shelter, belongs under the Constitution of the United States, exclusively to the federal government; and that the authority exercised in this instance by the Governor of Vermont, is repugnant to the Constitution of the United States.

It is, therefore, our opinion, that the judgment of the Supreme Court of Vermont ought to be reversed, and the cause remanded to that Court; and that it be certified to them, with the record, as the opinion of this Court, that the said George Holmes is entitled to his discharge, under the habeas corpus issued at his instance.

In the division, however, which has taken place between the members of the Court, a different judgment must be entered.

Mr. Justice THOMPSON.

This case comes up by writ of error from the Supreme Court of the state of Vermont, under the twenty-fifth section of the Judiciary Act of 1789. The proceedings in the state Court which are brought here for review, have been already so fully stated, that it is unnecessary for me to repeat them. It is sufficient for me to state, simply, that these proceedings are founded upon a writ of habeas corpus, under which George Holmes was brought up before the Supreme Court, claiming to be discharged from the custody of the sheriff, when he was held under a warrant from the Governor of Vermont, by which the sheriff was commanded to arrest the said George Holmes, as a fugitive from justice, from the province of Lower Canada, he having been there indicted for the crime of murder.

In the examination of this case I shall confine myself simply to the question, whether the case comes within the twenty-fifth section of the Judiciary Act, so as to give this Court jurisdiction and authority to review the proceedings in the Supreme Court of Vermont. I do not intend to examine the question, whether the proceedings upon a habeas corpus is "a suit," within the meaning of this

twenty-fifth section; or whether a writ of error will lie to review proceedings upon a habeas corpus. Although the case upon these points is not free from doubts; yet, thinking as I do, that this Court has not jurisdiction at all of the case, these points are of minor importance.

In the case of Crowell *vs.* Randall, 10 Peters, 391, this Court reviewed all the cases which had been brought before it under the twenty-fifth section, when the question of jurisdiction was brought under the consideration of the Court; which review resulted in the following conclusion: "That it has been uniformly held, that to give this Court appellate jurisdiction, two things should have occurred, and be apparent upon the record. First, that some one of the questions stated in the section did arise in the Court below. And, secondly, that a decision was actually made known by the same Court, in the manner required by the section. If both these do not appear on the record, the appellate jurisdiction fails. That it is not sufficient to show that such question might have occurred, or such decision might have been made in the Court below. It must be demonstrable that they did exist, and were made. That it is not indispensable, that it should appear on the record, in totidem verbis, or by direct and positive statement, that the question was made, and the decision given by the Court below on the very point. But, that it is sufficient, if it is clear from the facts stated, by just and necessary inference, that the question was made; and that the Court below must, in order to have arrived at the judgment pronounced by it, have come to the very decision of that question as indispensable to that judgment. That it is not sufficient to show that a question might have arisen or been applicable to the case, unless it is farther shown, on the record, that it did arise and was applied by the state Court to the case."

According to this construction of the law, it is clear that some one of the cases put in this section of the act did in point of fact arise, and was in point of fact decided upon in the state Court.

Let us test the case now before us by these rules. This record does not in any manner whatever point to the authority under which the Governor of Vermont claimed to have acted. Nor is there any treaty, or law of the United States, or any particular part of the Constitution alluded to in the record, with which the power exercised by the Governor is brought in conflict or decided against. In all the cases heretofore brought up under this provision in the Judiciary Act, the record puts the proceedings in the state Court upon some specific law or authority, under which the Court professed to act; and which enabled this Court to examine such claim on the part of the state Court, and to see whether it fell within the revising power of this Court. But as the proceedings in this case, in the state Courts, do not point to the authority under which the Governor claimed to have acted, we are left to mere conjecture upon that point. As the case stands upon this record, it is a mere exercise of power by the Governor, in arresting George Holmes for the purpose

of delivering him over to some person in Canada, authorized to receive him. This record does not show any demand, or even request by any authority in Canada, to have this done. From any thing that appears on this record, it was a self-moved action on the part of the Governor, under a sense of justice; that as he was charged with the crime of murder in Canada, and must be punished there, if anywhere, he saw fit to arrest him and send him there. Nothing appears on the record, in any manner whatever, warranting the conclusion that the state of Vermont had authorized the Governor to exercise such power; or that any arrangement had been made between the state and the government of Canada upon this subject. And admitting this to have been an arbitrary exercise of power, without even the colour of authority; it does not rest with this Court to control or correct the exercise of such power, unless the case is brought within some one of the three classes of cases specified in the act of Congress.

There is certainly no general power vested in this Court to revise any other cases. And according to the case of Crowell *vs.* Randall, it must appear, either directly, or by necessary inference, that some one of these questions did in point of fact arise, and was decided by the Court. As the record in this case does not point to any treaty, or law, or any part of the Constitution of the United States, or authority embraced by it, that was drawn in question, or that has been violated by the state Court; it makes it necessary to examine more at length, the several classes of cases mentioned in this twenty-fifth section, which fall under the revising power of this Court, to see whether this case can be brought within any of them. This section contains three specified classes. The first is, where is drawn in question the validity of a treaty, or statute of, or authority exercised under, the United States, and the decision is against their validity. This record, certainly, does not show that any treaty or law of the United States, or any authority exercised under the United States, was drawn in question at all; and, of course, there could have been no decision against their validity. The Court did not profess to act under, or against any such source of authority. The next class is, where is drawn in question the validity of a statute of, or an authority exercised under any state, on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favour of their validity. There is no treaty or law of the United States drawn in question, nor was there any statute of Vermont in any manner under the consideration of the Court, or any decision upon the validity of a statute of that state. The record does not furnish the slightest evidence that the state of Vermont had ever passed any law on the subject; and to draw the conclusion from the mere fact of surrender by the Governor, that the laws of the state had authorized it, is certainly looking to something not apparent on the record, which this Court has said cannot be done. If, therefore, the present case falls at all within this class, it must be because it was the exercise of an authority repugnant to the Consti-

3 c 2

tution of the United States. And then the question arises, what part of the Constitution has been violated, or is in conflict with the power exercised in this case. The argument at the bar did not point to any specific provision in the Constitution that has been violated, except the fifth amendment; which declares that no person shall be deprived of life, liberty, or property, without due process of law. It is unnecessary to stop to inquire whether this case falls within that provision, if it would be brought to bear upon it: for this Court has decided, that none of these amendments apply to the states, but are limitations upon the powers of the general government. 7 Peters, 247. The argument has rested principally upon the theory of our government, in relation to the treaty-making power, and the organ for conducting foreign intercourse. There is certainly no specific provision in the Constitution on the subject of surrendering fugitives from justice, from a foreign country, if demanded; and we are left at large to conjecture upon various parts of the Constitution, to see if we can find that such power is by fair and necessary implication embraced within the Constitution : I mean, whether any such obligation is imposed upon any department of our government, by the Constitution, to surrender to a foreign government a fugitive from justice. For unless there is such a power vested somewhere, it is difficult to perceive how the Governor of Vermont has violated any authority given by the Constitution to the general government. If such a power or obligation, in the absence of any treaty or law of Congress on the subject, rests anywhere, I should not be disposed to question its being vested in the President of the United States. It is a power essentially national in its character, and required to be carried into execution by intercourse with a foreign government: and there is a fitness and propriety of this being done through the executive department of the government, which is intrusted with authority to carry on our foreign intercourse. I do not mean to enter at large into the question of surrendering to foreign governments fugitives from justice. Whatever that power, or duty, or obligation may be, it is, in my judgment, not within the authority of this Court to regulate or control its exercise. In order to give such power to this Court, when the surrender has been made under authority of a state, it must appear to be repugnant to the Constitution, or an existing law or treaty of the United States. And unless the President of the United States is, under the Constitution, vested with such power, it exists nowhere; there being no treaty or law on the subject. And it appears to me indispensably necessary, in order to maintain the jurisdiction of this Court in the present case, to show that the President is vested with such power under the Constitution. This record shows that such power or authority has been expressly disclaimed by the President, on an application by the Governor of Vermont, in the year 1825. The Secretary of State, in answer to the letter of the Governor of Vermont on that subject, says, " I am instructed by the President to express his regret to your Excellency, that the request of the acting Governor of Canada cannot be complied with

under any authority now vested in the executive government of the United States; the stipulation between this and the British government, for the mutual delivery over of fugitives from justice, being no longer in force, and the renewal of it by treaty, being at this time a subject of negotiation between the two governments." Here, then, is a direct denial by the President of the existence of such a power in the executive, in the absence of any treaty on the subject. And such has been the settled and uniform course of the executive government of the United States upon this subject, since the expiration of our treaty with England. And if this be so, it may be emphatically asked, what power in the general government comes in conflict with the power exercised by the Governor of Vermont? In order to maintain the jurisdiction of this Court in the present case, it must be assumed that the President has, under and by virtue of the Constitution, in the absence of any treaty on the subject, authority to surrender fugitives from justice to a foreign government; otherwise it cannot be said, that the Governor of Vermont has violated the Constitution of the United States. If any such power is to be given to the President by treaty, it is not merely to regulate the mode and manner of exercising an existing power; but must be a treaty creating the power, and founded upon the mere comity of nations, and not resting upon any obligation, the performance of which a foreign nation has a right to demand of our government. This power to surrender fugitives from justice, to a foreign government, has its foundation, its very life and being, in a treaty, to be made between the United States and such foreign government; and is not, by the Constitution, vested in any department of our government, without a treaty. The power, therefore, exercised by the Governor of Vermont, can at most be only repugnant to a dormant power, resting entirely upon comity and reciprocity, to be established by treaty; and which may, by possibility, be brought into action at some future day, through the instrumentality of such a treaty. This, in my judgment, is too remote and contingent to fall under the protecting authority of this Court, under the twenty-fifth section of the Judiciary Act.

The remaining class of cases embraced in this section, is, where is drawn in question the construction of any clause of the Constitution, or of a treaty or statute of, or commission held under, the United States, and the decision is against the title, right, privilege, or exemption, specially set up or claimed by either party, under such clause of the said Constitution, treaty, statute, or commission.

This class points to some particular clause in the Constitution, or of a treaty, or statute, or commission, held under the United States; by which a right, title, privilege, or exemption is claimed, and the decision is against such claim. It may be again observed, that no treaty or law was drawn in question. Nor was any particular clause in the Constitution, conferring any privilege or exemption, in any manner whatever alluded to in the record, or can be supposed by any reasonable intendment to have been drawn in ques-

tion; except, perhaps, the fifth amendment, which, as it has been already shown, does not apply to the states, whatever may be its construction. Nor can the prohibition to the states to enter into any treaty, alliance, or confederacy, or into any agreement or compact with another state, or with a foreign power, be considered as drawn in question or violated. There is nothing in this record to warrant an inference, that the state of Vermont had ever entered into any agreement or compact with Canada, in relation to the surrender of fugitives from justice. The Governor of Vermont does not profess to act under any such agreement; and it is inconceivable, if any existed, why no allusion whatever is made to it in his warrant, or in the proceedings before the Court. The record, in my judgment, does not furnish the least evidence, justifying a conclusion that any treaty, compact, or agreement of any description, had been entered into between the state of Vermont and Canada, on the subject of surrendering fugitives from justice; and the case now before the Court is the only one, from any thing appearing on the record, where it has ever been attempted. And to construe this single isolated case, and that too, by the Governor alone, without any evidence of his acting under the authority of any statute of the state on the subject, to be an entering into a solemn compact or agreement between the state of Vermont and a foreign power, in violation of the article of the Constitution, which prohibits a state from entering into any compact or agreement with a foreign power; is a construction to which I cannot yield my assent.

I am not, therefore, able to discover how any question could have arisen, and been decided in the Supreme Court of Vermont, coming within the appellate power of this Court. This power is not only affirmatively declared and pointed to certain specified cases; but there is an express denial of the authority of this Court to go beyond such specific questions. The act declares, that no other error shall be assigned or regarded as a ground of reversal, than such as appears on the face of the record, and immediately respects the before-mentioned questions of the validity or construction of the Constitution, treaties, statutes, commission, or authority in dispute.

And it appears to me to be a very strong and cogent objection to taking jurisdiction in this case, that a reversal of the judgment will be entirely unavailing unless the Supreme Court of Vermont shall voluntarily discharge the prisoner. It is certainly not in the power of this Court to enforce its judgment. If the jurisdiction of this Court was clearly and plainly given, it might not be a satisfactory answer, that it could not execute its judgment. But where the authority of this Court depends upon a doubtful construction of its appellate power, it furnishes a persuasive reason against applying the power to a case which may result in a nugatory and fruitless judgment. It is not to be presumed that Congress would vest in this Court a power to judge, and decide, and withhold from it the authority to execute such judgment. It would be of no benefit to the party, and would be placing the Court in no very enviable a

situation. If the proceedings on a habeas corpus is a suit within the meaning of the Judiciary Act, an execution of the judgment is the fruit and end of the suit, and is very aptly called the end of the law. And the provisions contained in this twenty-fifth section of the Judiciary Act, show very satisfactorily in my judgment, that the revising power of this Court was not intended to be applied to any case where the Court could not execute its judgment. The act declares, that the writ of error shall have the same effect as if the judgment or decree complained of had been rendered or passed in a Circuit Court. And the proceedings upon the reversal shall also be the same, except that the Supreme Court, instead of remanding the cause for a final decision, as before provided, may at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution. This looks to a case where the state Court refuses to execute the judgment of this Court. No such provision is made or allowed, when the writ of error is to a Circuit Court of the United States. In such case, the Judiciary Act declares that the Supreme Court, shall not issue execution in causes that are removed before them by writs of error, but shall send a special mandate to the Circuit Court to award execution thereon. And what is the reason for this different mode of executing the judgment of this Court. It is because this Court can coerce the Circuit Courts to execute the mandate. The Judiciary Act gives to the Supreme Court the power to issue writs of mandamus, in cases warranted by the principles and usages of law, to any Courts appointed or persons holding office under the authority of the United States: and that the Courts of the United States shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law.

But no such coercive power is given over a state Court: and hence the necessity of authorizing this Court to execute its own judgment. If the Supreme Court of Vermont shall refuse to execute the judgment of this Court, requiring the discharge of the prisoner Holmes, can this Court in any way enforce its judgment? If it can be done at all, it must be by sending a habeas corpus to the sheriff or jailor, having the custody of the prisoner, to bring him here to be discharged. And if that officer shall return that he holds him under a commitment of the Supreme Court of Vermont, what can this Court do? We must remand him. And there ends our jurisdiction.

The Judiciary Act authorizes this Court to issue writs of habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law; with a proviso, however, that writs of habeas corpus shall in no case extend to prisoners in jail, unless where they are in custody under or by colour of the authority of the United States, or are

committed for trial before some Court of the same, or are necessary to be brought into Court to testify. (sec. 14.) The power, therefore, of this Court to execute its judgment is expressly taken away; and the prisoner obtains no relief. And can it be reasonably supposed, that Congress intended by this twenty-fifth section of the Judiciary Act, to embrace cases where the judgment must be a dead letter, and at most merely advisory, and the expression of an opinion upon an abstract question, but utterly fruitless, if the advice shall be disregarded. I cannot yield my assent to the assumption of a power which must place this Court in such a feeble, an inefficient situation. If this Court has the power to meet the exigency of the case at all, why not apply at once the appropriate and efficient remedy by habeas corpus; and relieve the prisoner from his illegal imprisonment. But if this power is denied to the Court, can it be that the act of Congress has clothed us only with the naked authority to advise the Supreme Court of Vermont to discharge the prisoner? I think not. And that it is, therefore, a case not embraced under the twenty-fifth section of the Judiciary Act; and that the appellate power of this Court canno: reach the case.

Mr. Justice BALDWIN delivered an opinion to the reporter, after the adjournment of the Court; which will be found in the Appendix, No. II.

Mr. Justice BARBOUR.

This case being brought before us by a writ of error, not from a Circuit Court of the United States, but from the Supreme Court of Judicature of Vermont, we have no jurisdiction over it; unless it comes within some one of the provisions of the twenty-fifth section of the Judiciary Act.

The class of cases described in that section, within which it is supposed that it comes, is defined in the following terms: " or where is drawn in question the validity of a statute of, or an authority exercised under, any state, on the ground of their being repugnant to the Constitution, treaties, or laws of the United States, and the decision is in favour of such their validity."

Now, the record does not, in terms, state on what ground the Court decided; the judgment only declares that the cause of detention and imprisonment, that is, the warrant of the Governor of Vermont, is good and sufficient in law. It must, then, according to the decision of this Court, appear, by clear and necessary intendment, that the question of the repugnancy of the authority exercised, either to the Constitution, or treaties, or laws of the United States, must have been raised, and must have been decided; in order to have induced the judgment.

As there is neither any treaty nor law, having relation to the case, the single inquiry is, whether there is any provision of the Constitution to which the authority in question is repugnant; because, if

[Holmes *vs.* Jennison et al.]

there be not, then it will follow, that there is no ground for the clear and necessary intendment, or for any intendment that such matter was drawn in question, and decided by the Court below; as is absolutely necessary to give this Court jurisdiction over a case brought here from a state Court.

I proceed, then, to examine the question whether the Constitution contains any such provision?

The only clause of that instrument, upon the subject of the surrender of fugitives from justice, is found in the second section of the fourth article, and is in these words; "A person charged in any state, with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime."

This provision, by the obvious import of its terms, has no relation whatsoever to foreign nations; but is confined in its operation to the states of the Union.

Nor, indeed, should we have expected to have found in such an instrument any provision upon the subject, except in relation to the states themselves. It is a compact of government between the states, for themselves, and not for others; it consists, therefore, of a designation of the powers granted; the division of those powers amongst the departments which it created; and of such reciprocal stipulations, limitations, and reservations, as the states thought proper to make. But it was no part of the purpose of its framers, to define the duties or obligations of the states, thus united, to foreign nations, or to prescribe the mode of their fulfilment.

There is no other clause of the Constitution, which, in terms, has even the remotest allusion to the surrender of fugitives from justice.

Before I proceed to examine the various provisions in the text of the Constitution, which have been relied upon as bearing upon the question; I will take notice of an argument urged at the bar, as being founded upon the fifth amendment to that instrument.

It was said, that the authority exercised in this case, was in violation of that part of the fifth amendment which declares, "that no person shall be deprived of life, liberty, or property, without due process of law." This argument is at once met and repelled by the decision of this Court, in the case of Barron *vs.* The Mayor and City and City Council of Baltimore, 7 Peters, 243; in which this Court decided, that the amendments to the Constitution of the United States, did not apply to the state governments. That they were limitations upon the power granted in the instrument itself; and not upon the power of distinct governments, framed by different persons, and for different purposes. To which I will add, what is matter of history, that so far from the states which insisted upon these amendments contemplating any restraint or limitation by them on their own powers; the very cause which gave rise to them, was a strong jealousy on their part of the power which they had granted in the Constitution. They, therefore, with anxious solicitude endea-

voured, by these amendments, to guard against any misconstruction of the granted powers, which might, by possibility, be the result of the generality of the terms in which they were expressed. But it is unnecessary to dwell longer on this point; because it is not only decided in the case just cited, but it is also declared in the case of Lessee of Livingston vs. Moore and others, 7 Peters, 551, 552, to be settled, that the amendments of the Constitution of the United States do not extend to the states.

I now return to the text of the Constitution itself. It was said in the argument, that by that instrument the whole foreign intercourse of the country was confided to the federal government. That as between foreign nations and the United States, the individual states are not known. That they are known only in their confederated character as the United States. That the question as to the surrender of fugitives from justice, being a national one, it follows as a consequence, that it can only be decided and acted upon by the United States.

It is admitted, that the regulation of our foreign intercourse is confided to the federal government. But, that the proposition thus generally propounded, may be reduced to a definite form; that we may have some standard of practical application by which to test the nature, character, and extent of this power over foreign intercourse, and its bearing upon the present question; it becomes necessary to examine the provisions of the Constitution which relate to it; for it is just that, and that only, which the provisions of that instrument have made it. The only clauses of the Constitution, as far as I am informed, which relate to our foreign intercourse, are : 1. The one which gives to the President, with the advice and consent of the Senate, power to make treaties, and to nominate, and, with the advice and consent of the Senate, to appoint ambassadors, other public ministers, and consuls. 2. That which gives to the President alone, power to receive ambassadors, and other public ministers. 3. That which absolutely prohibits the states from entering into any treaty, alliance, or confederation : and, lastly, that which prohibits them, without the consent of Congress, from entering into any agreement or compact with a foreign power. Thus it appears, that the whole power of foreign intercourse granted to the federal government, consists in this, that while it is authorized, through the President and Senate, to make treaties; the states are prohibited from entering into any treaty, agreement, or compact, with a foreign state. Now, there is nothing in the record to show that Vermont has violated this prohibition in the Constitution, because it does not appear that that state has entered into any treaty, agreement, or compact, whatsoever, with any foreign state.

The only argument, then, which can be urged to prove that the act done by the Governor of Vermont, is a violation of these provisions of the Constitution, must be this, if not in form, certainly in effect: The President and Senate have power to make treaties with foreign states, but Vermont has surrendered to a foreign state

[Holmes vs. Jennison et al.]

a fugitive from justice who was within her jurisdiction; therefore, Vermont has violated that part of the Constitution which authorized the President and Senate to make treaties. Can such a conclusion follow from such premises? I would respectfully say, that to me, it seems to be a non sequitur. I am ready to admit that the President and Senate can make treaties, which are not themselves repugnant to the Constitution. I further admit that, as by the usages of nations, as well as by the practice of the United States, the surrender of fugitives is deemed to be a proper subject for treaty; therefore it is competent to them to make treaties in relation to that subject. I further admit, that if a treaty had been made, by which the federal government had bound itself to surrender fugitives to a foreign nation, and one had been arrested under the treaty, for the purpose of being surrendered, and the judicial authority of Vermont had discharged him upon habeas corpus; then it might be said, that such discharge was repugnant to the treaty. But the question here is, not whether the act of the Governor of Vermont is repugnant to a treaty, for there exists none in relation to the subject; but the question is, whether it is repugnant to the Constitution, because, by that the President and Senate have power to make treaties for the surrender of fugitives, but which power they have not executed?

There are two classes of provisions in the Constitution, as to which this question may arise.

The first is, where the Constitution operates, per se, by its own intrinsic energy. In cases of this class, it is not necessary that any power should be exercised by any department of the federal government, to bring it into active operation. The Constitution is, in this class of its provisions, a perpetually self-existing impediment to any action on the part of the states, on the subjects to which they relate.

Thus, to exemplify: it declares that no state shall pass a "bill of attainder, ex post facto law, or law impairing the obligation of contracts." Now if a state were to pass either of the kinds of law which are thus prohibited; such a state law, or any authority exercised under it, would necessarily be repugnant to the Constitution. The thing done would be in direct opposition to the supreme law of the land, which had commanded that it should not be done. This class of cases, where there is an express prohibition, has no relation whatever to any conflict between the powers granted to the federal government, and those reserved to the states. Such a state law as I have just supposed, would be equally repugnant to the Constitution, whether there was or was not any power granted to the federal government over the subject on which such a state law operated. This class embraces also certain cases in which a power, such as had been previously exercised by the states, is granted to the federal government, in terms which import exclusion: such, for example, as the power granted to Congress, of exclusive legislation over the District of Columbia. In such a case, it has been held, that although there is no express prohibition upon the states, yet the terms of the grant, by necessary construction, imply it; because a provision that

one government shall exercise exclusive power, is tantamount to a declaration that no other shall; for if any other could, it would cease to be exclusive; and such a declaration is therefore in effect a prohibition. Here too, then, any action on the part of a state, upon a subject thus exclusively granted to the federal government, would be repugnant to the Constitution, operating by its own intrinsic energy, without any action by the federal government: because, as to such cases, the supreme law of the land has declared, in effect, that no state shall enter upon this field of power.

The second class of constitutional provisions, as to which this question of repugnancy may arise, consists of those powers granted to the federal government, which the states previously possessed; where there is nothing in the terms of the grant which imports exclusion, and where there is no express prohibition upon the states.

As to this class of powers, the great constitutional problem to be solved is, whether any of them can be construed as being exclusive. If they can, then the necessary consequence is, that the states cannot exercise them; whether the federal government shall or shall not think proper to execute them. If, on the contrary, they are not exclusive but concurrent, then the states may rightfully exercise them; and no question of repugnancy can ever rise whilst the power remains dormant and unexecuted by the federal government. Such a question can only occur when the actual exercise of such a power by the states comes into direct conflict with the actual exercise of the same power by the federal government. This characteristic of concurrent powers, is illustrated by the familiar example of the power of taxation. Thus, although the power of laying and collecting taxes is specifically granted to Congress, yet the states, as we all know, are in the habitual exercise of the same power, over the same people, and the same objects of taxation, and at the same time, as the federal government; except when the states are restrained by an express prohibition from acting on particular objects; that is, from laying any imposts or duties on imports or exports, beyond what may be absolutely necessary for executing their inspection laws. And but for that prohibition, I doubt not but that the states would have had as much power to lay imposts or duties on imports or exports, as to impose a tax on any other subject of taxation.

I hold the following proposition to be maintainable: That wherever a power, such as the states originally possessed, has been granted to the federal government, and the terms of the grant do not import exclusion, and there is no express prohibition upon the states, and the power granted to the federal government is dormant and unexecuted; there the states still retain power to act upon the subject. And I place this upon the ground that in such a case the question of repugnancy cannot occur, until the power is executed by the federal government. It is not repugnant to the Constitution, because there is not in that instrument either an express prohibition, nor that which is implied by necessary construction arising from words of exclusion. There is, therefore, nothing in the Constitution

[Holmes *vs.* Jennison et al.]

itself, operating by itself; as it does in cases of express prohibition or terms of exclusion; to which the exercise of such a power by the states is repugnant, or with which it is utterly incompatible. It is not repugnant to any law passed, or treaty made, by the United States, because my proposition in terms assumes that no such law has been passed, or treaty made.

I will add, in support of this view, that as the Constitution contains several express prohibitions upon the states, from the exercise of powers granted to the federal government; if we were to apply to its construction the maxim so well founded in reason, expressio unius, est exclusio alterius, it would seem to lead to the conclusion that all the powers were expressly prohibited which were intended to be prohibited; unless in cases of such necessary and inevitable construction as those in which the power is granted in terms of exclusion; which, as I have said, would cease to be exclusive, if the states could still exercise them, and which therefore present a case of absolute incompatibility.

From these general principles I now proceed to the examination of some of the cases in this Court, in relation to this question.

In Sturges *vs.* Crowningshield, 3 Wheat. 122, there is a good deal of discussion on this subject. In page 193 of that case, the Chief Justice says, "These powers [he is speaking of the powers granted to Congress] proceed not from the people of America, but from the people of the several states; and remain after the adoption of the Constitution what they were before, except so far as they may be abridged by that instrument. In some instances, as in making treaties, we find an express prohibition; and this shows the sense of the convention to have been, that the mere grant of a power to Congress, did not imply a prohibition on the states to exercise the same power. But it has never been supposed that this concurrent power of legislation extended to every possible case in which its exercise by the states has not been expressly prohibited. The confusion resulting from such a practice would be endless. The principle laid down by the counsel for the plaintiff, in this respect, is undoubtedly correct. Whenever the terms in which a power is granted to Congress, or the nature of the power require that it should be exercised exclusively by Congress, the subject is as completely taken from the state legislatures as if they had been expressly forbidden to act on it." After these general remarks, he propounds this question: "Is the power to establish uniform laws on the subject of bankruptcies, throughout the United States of this description?" That is, as explained in the immediately preceding paragraph, one where the terms in which the power is granted to Congress, or the nature of the power, required that it should be exclusively exercised by Congress.

After much other reasoning on the subject, and, amongst other difficulties, stating that of discriminating with any accuracy between insolvent and bankrupt laws, we find him using the following language: "It does not appear to be a violent construction of the Con-

stitution, and is certainly a convenient one, to consider the power of the states as existing over such cases as the laws of the Union may not reach. But be this as it may, the power granted to Congress may be exercised or declined, as the wisdom of that body shall decide. If, in the opinion of Congress, uniform laws concerning bankruptcies ought not to be established, it does not follow that partial laws may not exist, or that state legislation on the subject must cease. It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the states." He proceeds to say, that the circumstance of Congress having passed a bankrupt law, had not extinguished, but only suspended the right of the states. That the repeal of the bankrupt law could not confer the power on the states, but that it removed a disability to its exercise which had been created by the act of Congress.

In 5 Wheat. 21, Judge Washington, in delivering the opinion in the case of Houston *vs.* Moore, distinctly asserts, that if Congress had declined to exercise the power of organizing, arming, and disciplining the militia of the several states, it would have been competent to the state governments to have done so, in such manner as they might think proper.

In Wilson and others *vs.* The Blackbird Creek Marsh Company, 2 Peters, 251, 252, the legislature of Delaware had passed a law which stopped a navigable creek. In the argument, it was contended, that this law came in conflict with the power of the United States " to regulate commerce with foreign nations, and among the several states." The Chief Justice, in answer to this argument, said, " If Congress had passed any act which bore upon the case, the object of which was to control state legislation over those small navigable creeks, into which the tide flows, and which abound throughout the lower country of the middle and southern states, we should feel not much difficulty in saying, that a state law, coming in conflict with such act, would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution, is placed entirely on its repugnancy to the power to regulate commerce with foreign nations, and among the several states; a power which has not been so exercised as to affect the question." He concluded by saying, that the Court did not consider the law in question, " under all the circumstances of the case, as repugnant to the power to regulate commerce, in its dormant state, or as being in conflict with any law passed on the subject."

If, then, it be true, that it is not the mere existence of a power, but its exercise, which is incompatible with the exercise of the same power by the state; and that, too, where the power given was in express terms, " to establish uniform laws on the subject of bankruptcies, throughout the United States," the term " uniform" making the case stronger than where the grant contains no such term: and if it be also true, that the law of Delaware was not repugnant to

[Holmes *vs.* Jennison et al.]

the power to regulate commerce, in its dormant state; then it seems to me that I have sufficient grounds for the proposition which I have laid down.

Let me, then, apply that proposition, and the principles of this Court to this case. I have admitted that the President and senate might make a treaty for the surrender of fugitives from justice, but they have not done so : that power, in relation to this subject, is in a dormant state : the power exists, but has not been exercised : without the exercise of that power by the President and senate, the federal executive has no power to surrender fugitives from justice. This was the authoritative declaration of our government in 1791, when Mr. Jefferson, then Secretary of State, held the following language : "The laws of the United States, like those of England, receive every fugitive, (that is, as he had just said before, in the same communication to President Washington, the most atrocious offenders as well as the most innocent victims,) and no authority has been given to our executive to deliver them up." The same authoritative declaration was made by Mr. Clay, by direction of President Adams, in the year 1825, in answer to a demand from Canada; and the reason assigned was, that the treaty upon that subject was no longer in force.

It appears, then, that there is no treaty on the subject of surrendering fugitives; that without such treaty the federal executive has no authority to surrender; the authority, then, exercised by the Governor of Vermont, is not repugnant to the power of making treaties, in its dormant state : because, in the language of the Chief Justice, before cited, it is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states. It is said by one of the judges, in delivering his opinion in the case of Houston *vs.* Moore, that the powers of the federal government are exclusive of the states, when there is a direct repugnancy, or incompatibility in the exercise of it by the states. It is not said, whether this repugnancy is produced by the mere existence of the power in the federal government, or by its exercise. But he gives as examples of this, the power to establish a uniform rule of naturalization, for which he refers to Chirac *vs.* Chirac, 2 Wheat. 259. 269; and the delegation of admiralty and maritime jurisdiction, for which he refers to 1 Wheat. 304. 337. In the case in 2 Wheat., the Chief Justice does say, "that the power of naturalization is exclusively in Congress, does not seem to be, and certainly ought not to be controverted." But the point made, and which immediately precedes this remark was, that the law of Maryland, according to which the party had taken the oaths of citizenship, had been virtually repealed by the Constitution of the United States, and the act of naturalization enacted by Congress. The remark then was made in relation to a power which had been executed. But the case of Sturges *vs.* Crowningshield, was decided after that of Chirac *vs.* Chirac; and in that later case, it was declared, that it was not the mere existence, but the exercise of the power,

which is incompatible with the exercise of the same power by the states: and what makes this principle especially applicable is, that the power of establishing a system of naturalization, and bankrupt laws, is contained in the same clause, and expressed, identically, in the same terms. So that if the mere existence of the power as to bankruptcy, without its exercise, does not prohibit the states from acting on it; by like reason, the mere existence of the power as to naturalization, without its exercise, does not prohibit them from acting on it.

It is said in 1 Wheat. 337, arguendo, by the Court; for it was not the point to be decided that admiralty and maritime jurisdiction is of exclusive cognisance. It would seem, from the reasoning of the Court, as if this rested upon these grounds: That the Constitution is imperative on Congress, to vest all the judicial power of the United States, in the Courts of the United States; that the judicial power was declared to extend to all cases of admiralty and maritime jurisdiction; and that, therefore, by the terms in which the clause was expressed, the jurisdiction was made exclusive. Such also, seems to be the principle laid down in 1 Kent's Commentaries, 351; where the author says: "Whatever admiralty and maritime jurisdiction the District Courts possess, would seem to be exclusive; for the Constitution declares, that the judicial power of the United States, shall extend to all cases of admiralty and maritime jurisdiction; and the act of Congress of 1789, says, "that the District Courts shall have exclusive, original cognisance of all civil causes of admiralty and maritime jurisdiction." It seems to me, then, that neither of these cases impugns the principles which I have laid down.

I consider it wholly irrelative to this case, to inquire whether the authority exercised by the Governor of Vermont was, or was not, justified by the Constitution and laws of that state. Not only would the words of the act of Congress, under which this case has been brought up, clearly require this construction; but this Court has expressly decided the question, in the case of Jackson *vs.* Lamphire, 3 Peters, 280, in which they say, that this Court has no authority, on a writ of error from a state Court, to declare a state law void, on account of its collision with a state constitution.

Upon these grounds I am of opinion, that this case does not come within the provisions of the twenty-fifth section of the Judiciary Act; and consequently, that the writ of error ought to be dismissed, for want of jurisdiction.

Mr. Justice CATRON.

To distinguish this cause from others that often arise in the states where statutes exist authorizing the arrest of fugitives from justice from other states, and foreign goverments, it becomes necessary to ascertain precisely what the case before us is.

First, it must be recollected, there is no statute in Vermont prohibiting those charged with crimes in other states, or foreign coun-

tries, from coming into that state, or authorizing their apprehension if they come there: so we understand the fact to be; and that the authority to issue the warrant of arrest in this case was assumed by the Governor, as chief magistrate and representative of the state.

Holmes had been guilty of no crime against the laws of Vermont; but the warrant recites he was a subject of the province of Lower Canada; that he stood indicted for the crime of murder there; and that it was fit and expedient that he should be made amenable to the laws of that province for the offence.

The sheriff, in his return to the writ of habeas corpus, certifies that this warrant was the sole cause of detention and imprisonment.

He was not commanded to hold Holmes to answer to the authorities of Vermont; but ordered forthwith to convey and deliver him to William Brown, the agent of Canada, or to such person or persons, as by the laws of said province should be authorized to receive the same, at some convenient place on the confines of the state, and the province of Canada; to the end that the said George Holmes might be thence conveyed to the district of Quebec, and there be dealt with as to law and justice appertained.

We will assume, for the present, and for the purposes of the argument, that an agreement to surrender, on which the arrest was founded, existed between the executive chief magistrate of Vermont, and the Queen of Great Britain; that William Brown was the agent of Great Britain, and represented that kingdom; that Governor Jennison represented Vermont; and that the arrest was made in part execution of such previous agreement.

In such case, I admit, the act would have been one as of nation with nation, and governed by the laws of nations; that the agreement would have been prohibited by the Constitution, and the arrest, in part execution of it, void; and that the judgment of the state Court in favour of the validity of the arrest should be reversed.

But that Court was not called on to decide, (taking the facts assumed to exist,) nor are we permitted to determine, in this case, how far the state Courts and magistrates may go in dealing with fugitives from justice coming within their limits, when executing the statutes of the states. No such question has been raised at the bar, nor has it been considered of by the Bench.

This is the substance of my opinion drawn up at length, on the point in this cause, on which, for a time, I thought the judgment below ought to be reversed. I founded myself upon the fact, that an agreement to arrest and surrender Holmes had been made between Vermont and Great Britain, before the arrest took place; and that it was made in part execution of such previous agreement. Neither on the argument of the cause, nor at any time previous to hearing read the opinion of my four Brethren, drawn up by the Chief Justice, and with the result of which I had intended to concur, had it occurred to me the fact was doubtful. In that opinion,

however, it is declared, that "nothing appears that a demand was made by Canada of Holmes; and we do not act upon the supposition such a demand was made; nor consider it in the case." Now if no demand was made, I take it as granted, no agreement existed between Great Britain and Vermont for the surrender of Holmes. To assume that a general regulation by treaty, or agreement, existed between the state and the foreign kingdom, on which the Governor's warrant founds itself, and from which the regulation must be inferred, would be charging the chief magistrate of Vermont with a palpable violation of the Constitution of the United States, on the ground that he assumed the power of foreign intercourse. There is nothing in the record to establish such a conclusion; nor can it be assumed, with any propriety, on mere conjecture. It is manifest to my mind, the facts stated in the warrant have reference to this individual case. The arrest could, therefore, not have been made in part execution of any compact or agreement between the state and kingdom: it follows a judgment of reversal could only be founded on the intention of the Governor to make a future agreement, at the time Holmes should be surrendered to Brown, or to some sheriff, or other officer, or agent of Canada, having lawful authority to receive the prisoner. The intent, we are not authorized to try; we only have jurisdiction to examine into acts done; and must proceed, if at all, on some past violation of the Constitution of the United States, supposed to be that clause which declares, "no state shall, without the consent of Congress, enter into any agreement or compact with another state, or with a foreign power."

The defendant, Holmes, is yet in prison under the governor's warrant of arrest; no agreement to surrender him yet exists, and none may ever be made with Great Britain: the act done by the governor, is singly that of Vermont, and, therefore, cannot violate the recited clause of the Constitution.

All my brethren, those who are for reversing the judgment, and those who are for dismissing the writ of error, have adopted, and are acting on the supposition that no demand to surrender Holmes can be inferred from the facts recited in the warrant of the governor: and that the fact is considered out of the case.

After much consideration, I entertain some doubts, whether such an inference could be safely made; and deem it due to the opinion of all my brethren, on the finding of a mere fact in so delicate a matter, to concur with them in the conclusion that no demand was made, and that, consequently, no agreement existed; and therefore to concur with those who think the writ of error should be dismissed. A consequence inevitable to my mind, viewing the case in this aspect.

That an intent to surrender is equivalent to an agreement between two states, and therefore the arrest in violation of the Constitution of the United States; is a doctrine calculated to alarm the whole country.

The Constitution equally cuts off the power of the states to agree with each other, as with a foreign power: yet, it is notoriously true, that for the fifty years of our existence under the Constitution, the states have, in virtue of their own statutes, apprehended fugitives from justice from other states, and delivered them to the officers of the state where the offence was committed; and this, independently of the fourth article and second section of the Constitution, and the act of Congress of 1793, ch. 51, which provides for a surrender on the demand of the executive of one state upon that of another. The uniform opinion heretofore has been, that the States on the formation of the Constitution, had the power of arrest and surrender in such cases; and that so far from taking it away, the Constitution had provided for its exercise, contrary to the will of a state, in case of a refusal; thereby settling, as amongst the states, the contested question, whether on a demand, the obligation to surrender was perfect and imperative, or whether it rested on comity, and was discretionary.

After having had written out for me the very able argument delivered before this Court, for the plaintiff in error; and after having bestowed much reflection on this subject, and written out my views on every point involved, as the safest mode of testing of their accuracy; I have come to the conclusion, divided as the Court is, that it is better for the country this question should for the present remain open.

And I here take the occasion to say, that I hold myself free, and uncommitted by this opinion, or by any thing occurring in this cause, to decide in future cases according to their character, and the conclusions I may then form.

I concur, that a proceeding by habeas corpus is a suit, within the meaning of the Judiciary Act, sec. 25 : and that a refusal to discharge a defendant is a final judgment in such suit.

1. But whether a writ of error will lie, must depend, in every case, on the fact:—This Court only has jurisdiction where the decision in the state Court has drawn in question the validity of a treaty, or statute of, or an authority exercised under, the United States; and the decision is against their validity.

2. Or, where is drawn in question the validity of a statute of, or an authority exercised under any state, on the ground of their being repugnant to the Constitution, &c., of the United States; and the decision is in favour of such, their validity.

3. Or, where is drawn in question the construction of any clause of the Constitution, &c.; and the decision is against the right claimed under such clause.

The agreement being out of the case, the arrest, as an authority exercised under the state, and the decision in favour of its validity, could not be repugnant to the Constitution; as the Court did not uphold an agreement, or an exercise of authority under any. Nor can I find that the decision below drew in question the construction of any other clause of the Constitution, more than one prohibiting

[Holmes vs. Jennison et al.]

agreements with foreign powers. There being no agreement in the case; certainly none of the exclusive powers secured to the general government, to declare war, to send ambassadors, to make treaties, or to regulate commerce with foreign nations, were violated; as no national intercourse of any kind was had by Vermont with the authorities of Great Britain.

Whether the arrest violated the laws of Vermont, is immaterial to this Court; we have no power under the twenty-fifth section to interfere, and must leave parties injured to seek redress in the state Courts.

It follows from the nature of the case, this Court has no jurisdiction to entertain the writ of error; which, I think, should be dismissed.

This cause came on to be heard on the transcript of the record from the Supreme Court of judicature of the State of Vermont, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that this writ of error to the said Supreme Court be, and the same is hereby, dismissed for the want of jurisdiction.

———

NOTE.—The Reporter has inserted this case in the present volume of reports, although no decision on the questions presented to the Court was given. The principles, discussed with great ability by the counsel for the plaintiff in error, the importance of the questions involved in it, and the great judicial learning and knowledge contained in the opinions delivered by the justices of the Court, are of the highest interest. Although no judgment was given in the case, it will be seen that a majority of the Court concurred in the opinion that the Governor of the state of Vermont had not the power to deliver up to a foreign government a person charged with having committed a crime in the territory of that government.

After this case had been disposed of in the Supreme Court of the United States, on a habeas corpus issued by the Supreme Court of Judicature of the state of Vermont, George Holmes was discharged. The judges of that Court were satisfied, on an examination of the opinions delivered by the justices of the Supreme Court, that by a majority of the Court it was held, that the power claimed to deliver up George Holmes did not exist.